JACK DUNCAN, Appellant, v. CITY OF DES MOINES, POLK COUNTY, IOWA, Appellee.

No. 43475.

July 31, 1936.

Milton W. Strickler, for appellant.

C. I. McNutt and F. T. Van Liew, for appellee.

H. T. Garrett, Assistant Attorney General, and R. E. Williams, Amici Curiae.

PARSONS, C. J.—The Forty-sixth General Assembly of Iowa enacted House File 173 as Chapter 61. This now appears in the Code of 1935 as Chapter 292-G1 under the title "Personal Service Trades". Section 1 of the act (Code 1935, section 5786-g1) declares a state and national emergency productive of widespread unemployment and disorganization of trade, and declares among the trades particularly affected are those in which the services are rendered upon the person or persons without necessarily involving the sale of merchandise, and that in such trades there is ruinous price-cutting, widespread unemployment and economic distress, and for the purpose of ameliorating such conditions, it is necessary and desirable to authorize the adoption of ordinances providing for fair competition applicable to such trades in the various cities and towns of the state. The second section of the act (Code 1935, section 5786-g2) applies only to those trades where personal services are rendered a person or persons without the sale of merchandise, as such, which are referred to as service trades. In the third section (Code 1935, section 5786-g3) it is provided that in all cities or towns under 2,500 population, the owners, operators or managers of not less than 65%, and in all cities and towns of 2,500 population or over, the owners, operators and managers of not less than 70% of the business establishments in any such service trade in any city or town may apply to the governing body of such city or town for the enactment of an ordinance providing for fair com-

petition for such trade within such city or town. The councils of the cities and towns shall have jurisdiction within such cities and towns to carry out within their respective jurisdictions the provisions of the chapter. Section 5 of the act (Code 1935, section 5786-g4) holds that any violation of the provision of any ordinance adopted under the provisions of this chapter shall constitute a misdemeanor. That each and every day's violation shall constitute a separate offense, and each offense is punishable by a fine of not more than one hundred dollars or imprisonment for not more than thirty days. The sixth section (Code 1935, section 5786-g5) provides as follows:

"The application for an ordinance providing for fair competition shall state the number of business establishments in the city or town engaged in the trade petitioning for such ordinance, and signature of only one person respectively signing on behalf of a business establishment, shall be counted in determining the percentage of establishments making application. The application shall set forth the provisions of the requested ordinance. Such ordinance may contain any other fair trade practice provisions which are not unlawful."

The seventh section (Code 1935, §5786-g6) provides for the approval, rejection or repeal of such application for such an ordinance, and provides:

"and thereafter such adopted ordinance shall regulate as to matter contained therein the conduct of every person engaged in such service trade within its jurisdiction."

The questions in this case arise under the passage of an ordinance in the City of Des Moines, No. 4278, which contains eight sections, the first section being applicable to barbering services, and contains 22 sub-sections, one of which sub-sections contains sub-sections a, b, and c, all regulating the operation of barber establishments. The second section provides the following:

"Section 2. The following are the minimum prices which may be charged for the rendering of the barber services hereinafter named, either singly or in combination, when such services have been rendered by a practitioner of barbering licensed in this state:

Hair Cut . . . . Forty Cents (40c)

| Shave | . | . | . | Twenty-Five Cents (25c) |
|---|---|---|---|---|
| Shampoo | . | . | . | Thirty-Five Cents (35c) |
| Facial Massage | | . | | Thirty-Five Cents (35c) |
| Tonic | . | . | . | Twenty-Five Cents (25c) |
| Singe | . | . | . | Twenty-Five Cents (25c) |
| Facial Steam | | . | | Twenty-Five Cents (25c)'' |

Other sections provide that the State Health Officer shall enforce the provisions of the ordinance; that there shall be an annual inspection fee of Three ($3.00) Dollars. Section 6 provides that one resisting the enforcement of any of the provisions of this ordinance shall upon conviction be fined not more than 100 dollars, or be imprisoned not to exceed thirty days, and that each day's violation is to constitute a separate offense.

This ordinance was evidently aimed to control the practice of barbering in the City of Des Moines, Iowa, by Chapter 124-B2 (section 2585-b11 et seq.) first appearing in the Code of 1927, having been passed by the 42d General Assembly as Chapter 48, dealing with the trade of barbering. The Chapter 124-B1 (section 2585-b1) dealing with cosmetology, passed at the same general assembly as chapter 49. All these appear in the Code of 1927 and in the Code of 1935 under Title VIII, headed "Practice of Certain Professions affecting the Public Health". Included in Title VIII is Chapter 114-G1, Basic Science Law; Chapter 115, General Provisions; Chapter 116, Practice of Medicine and Surgery; Chapter 117, Practice of Podiatry; Chapter 118, Practice of Osteopathy and Surgery; Chapter 119, Practice of Chiropractic; Chapter 120, Practice of Nursing; Chapter 121, Practice of Dentistry; Chapter 122, Practice of Optometry; Chapter 123, Practice of Pharmacy; Chapter 124-C1, Embalming; Chapter 124-B1, Cosmetology; Chapter 124-B2, Barbering. So that on the face of it, the city council is apparently endowed with pretty wide jurisdiction over many professions; that it would be clearly within the power of such bodies to so regulate, if the regulation as to barber shops is to be upheld.

It is true, and it cannot be disputed, that many of these enumerated subjects come, to a certain extent, within the police powers of the state for certain purposes. It is the duty of the state to guard the public health, but the question arising under this legislation would be: May the legislature and the city council regulate the practice of these professions, or various char-

acters of service rendered thereunder, by providing a scale of prices that may be charged?

This case was brought by the plaintiff, a barber by profession, or occupation, to enjoin the enforcement of ordinance No. 4278. No question was raised as to this being a proper proceeding, so involved in this action is not only the act of the Iowa Legislature passed by the 46th General Assembly, and now Chapter 61 of the Code of 1935, but there is also involved the validity of the ordinance 4278 of the City of Des Moines. The particular part of the ordinance struck at in this action is that portion of Section 2 fixing the minimum charges to be made for service. The charge as to the validity of the ordinance is that it is inimical to the provisions of the Fourteenth Amendment of the Constitution of the United States, and of the provisions of the Constitution of the State of Iowa, particularly the provisions of Section 2 of the ordinance.

At the conclusion of the case the court dismissed the petition of plaintiff, thus holding that the statutes and ordinance involved were valid and legal. From this finding of the court the appeal was taken.

It would seem to be evident that if the minimum price may be fixed, so may be the maximum. If this ordinance had been so drawn as to fix the maximum price that could be charged, and not the minimum, there perhaps would be an attack upon the ordinance raising practically the same questions, but from other persons, especially if the maximum price was materially lowered over prevailing prices. Then we might have in this action a different plaintiff than the one now in. But they would be based essentially upon the same thought, that it was beyond the power of the legislature to fix prices that could be charged for the services rendered; and that the business, trade or profession affected came under the provisions of both state and federal constitutions as to price regulating, and thus would hold that each individual engaged in the business would not have the right to regulate his own prices for which he would perform services.

If the legislature has the power to fix the price for barbering, it might be contended that the legislature would have the power to fix the fee that a physician or surgeon could charge; or it might be that the dentist could be thus regulated, and other

professions affected. Merely because one is required to take out a license to practice a profession, it does not necessarily follow that his charges are to be regulated by an act of the legislature, or the act of the city council. And neither is it necessary that one in entering any of these occupations take himself out of the provisions of the Constitutions, both State and Federal, and submit to having his business conducted and governed entirely in the remuneration to be received, or the prices to be charged, by an act of the legislature contrary to constitutional provisions. If so, then one entering any of the professions, or going into almost any business that is in any way subject to regulation under statutes passed under the police power of the state, can be held to surrender and give up all of his rights to protection in such occupations which do come within the protection of constitutional provision.

■■■ Naturally, the discussion of this case calls as the first subject the protection given under the Federal Constitution. The Fifth Amendment provides that no person shall be deprived of life, liberty, or property, without due process of law. This is one of the amendments added shortly following the adoption of the Federal Constitution, and it is one of those declared from time to time to have been adopted as a limitation upon the powers of Congress. The Fourteenth Amendment was adopted following the Civil War, and it provides, ''nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.''

It will be observed that this provision in the Fourteenth Amendment operates upon the State, and says to the State that it cannot go to the extent in its legislation of depriving any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws. Under this provision there have been various decisions by the courts touching, we think, the questions involved here.

Adkins v. Children's Hospital, 261 U. S. 525, 43 S. Ct. 394, 397, 67 L. Ed. 785, 24 A. L. R. 1238, had under consideration an act of Congress applicable to all occupations within the District of Columbia, giving a regularly constituted board and its ad-

visers the power to fix for women a minimum wage, sufficient to supply the necessary cost of living, which was held unconstitutional. It was attacked upon the ground that it authorized an unconstitutional interference with the freedom of contract included within the guaranties of the due process clause of the Fifth Amendment, and that the right to contract about one's affairs is a part of the liberty of the individual protected by this clause, as settled by the decisions of the court, and is no longer open to question. Within this liberty are contracts of employment of labor. It holds that the right of a person to sell his labor upon such terms as he deems proper is, in its essence, the same as the right of the purchaser of labor to prescribe the conditions upon which he will accept such labor from the person offering to sell. In all such particulars the employer and the employee have equal right, and any legislation that disturbs that equality is an arbitrary interference with the liberty of contract, which no government can legally justify in a free land. The opinion says:

"Included in the right of personal liberty and the right of private property—partaking of the nature of each—is the right to make contracts for the acquisition of property. Chief among such contracts is that of personal employment, by which labor and other services are exchanged for money or other forms of property. If this right be struck down or arbitrarily interfered with, there is a substantial impairment of liberty in the long-established constitutional sense. The right is as essential to the laborer as to the capitalist,—to the poor as to the rich; for the vast majority of persons have no other honest way to begin to acquire property, save by working for money." The opinion further says, "An interference with this liberty so serious as that now under consideration, and so disturbing of equality of right, must be deemed to be arbitrary, unless it be supportable as a reasonable exercise of the police power of the state."

Williams v. Standard Oil Co., 278 U. S. 235, 49 S. Ct. 115, 116, 73 L. Ed. 287, 60 A. L. R. 596, lays down the rule that a state legislature is without constitutional power to fix prices at which commodities may be sold, services rendered or property used, unless the business or property involved is affected with a public interest. And that in order to be affected with a public

interest so as to be subject to public regulation, a business or property must be such, or be so employed, as to justify the conclusion that it has been devoted to a public use, and its use thereby in effect granted to the public. This case lays down the further rule that the business of dealing in gasoline is not affected with a public interest which will enable the state to fix prices for its sale.

The state of Tennessee undertook to fix the prices at which gasoline might be sold within the state. Suit was brought in the courts below to enjoin the state officers from carrying out their intention to enforce the act, and institute criminal proceedings for violation of the act against appellees, and to have the act declared unconstitutional and void. In discussing the rule that foreign corporations may not carry on their business within the state except by complying with the conditions prescribed by the state, the court says:

"While that is the general rule, a well-settled limitation upon it is that the state may not impose conditions which require the relinquishment of rights guaranteed by the Federal Constitution."

Southwest Utility Ice Co. v. Liebmann, 52 Fed. (2d) 349, 352, a decision by the Circuit Court of Appeals of the Tenth Circuit, held, that although a business is affected with a public interest, it does not subject it to unlimited regulation, and might not impose unreasonable and unnecessary restrictions. The court said:

"The authority to regulate the conduct of a business or to require a license, comes from a branch of the police power which may be quite distinct from the power to fix prices. The latter, ordinarily, does not exist in respect of merely private property or business, citing Chesapeake & Potomac Tel. Co. v. Manning, 186 U. S. 238, 22 S. Ct. 881, 46 L. Ed. 1144, but exists only where the business or the property involved has become 'affected with a public interest'." It says further: "The significant requirement is that the property shall be devoted to a use in which the public has an interest, which simply means,—that it shall be devoted to a 'public use'. Stated in another form, a business or property, in order to be affected with a public interest, must be such or be so employed as to justify the conclusion that it has

been devoted to a public use and its use thereby in effect granted to the public."

The fact that a business is "affected with a public interest" does not subject it to unlimited regulations. Wolff Packing Co. v. Court of Industrial Relations, 262 U. S. 522, 43 S. Ct. 630, 67 L. Ed. 1103, 27 A. L. R. 1280; Tyson & Bros. v. Banton, 273 U. S. 418, 47 S. Ct. 426, 428, 71 L. Ed. 718, 58 A. L. R. 1236. This latter case says:

"The right of the owner to fix a price at which his property shall be sold or used is an inherent attribute of the property itself, and as such, within the protection of the due process of law clauses of the Fifth and Fourteenth Amendments. The power to regulate property, services, or business can be invoked only under special circumstances; and it does not follow that because the power may exist to regulate in some particulars it exists to regulate in others or in all." It further says: "The regulation of price at which ice may be sold is extraordinary interference with the liberty of citizens."

The Supreme Court of the United States, in a case decided June 1st of this year, entitled Morehead v. People of New York ex rel. Tipaldo, 56 S. Ct. 918, 80 L. Ed. 1347, 103 A. L. R. 1445, followed this line of cases and declared invalid an act of the legislature of New York fixing the prices that should be paid to women laborers in laundries, and held the act unconstitutional.

For the reasons hereinbefore discussed, it will be seen that under the Federal Constitution the ordinance adopted by the City of Des Moines, in question in this case, is clearly unconstitutional and the State cannot authorize city and town councils to enact any such ordinance. The Fourteenth Amendment forbids it and can bear no other possible construction under these decisions than that enacted as it was by the law-making power of the State, the act of the legislature in question, in so far as it undertakes to delegate this power to cities and towns, is doing that which is forbidden by the Constitution of the United States. And even if it were permitted by the Constitution of the State of Iowa, it would be invalid, because the language of the Fourteenth Amendment is "nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The Constitution of this State contains section 1 of Article I, known as the Bill of Rights. This section is as follows:

"All men are, by nature, free and equal, and have certain inalienable rights—among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining safety and happiness."

Section 9 of the Bill of Rights, in the last clause thereof, says:

· "But no person shall be deprived of life, liberty, or property, without due process of law."

This, it will be observed, conveys the same idea as is contained in section 1 of the 14th Amendment of the Federal Constitution,

"nor shall any State deprive any person of life, liberty, or property, without due process of law."

There would be no difference, and could be no difference, in the construction of these two clauses, the one in the Federal Constitution in the Fourteenth Amendment, and the other in the 9th section of the Bill of Rights of the State.

The Iowa Constitution was adopted in 1857, several years prior to the adoption of the Fourteenth Amendment to the Federal Constitution, so insofar as the power of the State of Iowa is concerned, as long as this Constitution remains in effect, we have exactly the same thought in the clause quoted from the Fourteenth Amendment as that in the Iowa Constitution adopted previously.

Section 1 of the Bill of Rights is essentially the same as in the Constitution of 1846. Under either of these sections as contained in the first and second Constitutions of the State of Iowa, the rights of all men have included, amongst those rights, the right of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety and happiness. So that essentially in the rights aimed to be established by the Constitution of the State of Iowa appearing long prior to the adoption of the Fourteenth Amendment of the Federal Constitution, were all of the rights the Fourteenth Amendment, in the clauses quoted, undertakes to protect. So that these decisions cited from the Supreme Court of the United

States could well have been made under the provisions of the Constitution of the State of Iowa, as they existed long before the adoption of the Fourteenth amendment, and as they exist to this day.

As to these matters, the views we have expressed in this opinion find ample support in many more federal decisions and in the decisions of state courts. Kent Stores of New Jersey v. Wilentz, (D. C.) 14 Fed. Supp. 1; State ex rel. Fulton v. Ives, (Fla.) 167 So. 394, 399. In the latter case, quoting from Coppage v. State of Kansas, 236 U. S. 1, 35 S. Ct. 240, 59 L. Ed. 441, L. R. A. 1915C, 960, the Florida court says:

"Included in the right of personal liberty and the right to private property is the right to make contracts for the acquisition of property. Chief among such contracts is that of personal employment by which labor and other services are exchanged for money or other forms of property. If that right be stricken down or arbitrarily interfered with, there is a substantial impairment of liberty in the long-established constitutional sense."

 The statute under discussion here contained an emergency clause reciting:

"A state and national emergency productive of widespread unemployment and disorganization of trade which burdens commerce and affects the public welfare, is hereby declared to exist, causing an emergency which injuriously affects the morale and standard of living and threatens to affect the industrial peace and safety and health of the people of the state. Among the trades particularly affected are those in which services are rendered upon a person or persons without necessarily involving the sale of merchandise. In such trades there is ruinous price-cutting, widespread unemployment and economic distress, and for the purpose of ameliorating such conditions, it is necessary and desirable to authorize the adoption of ordinances providing for fair competition applicable to such trades in the various cities and towns of the state, as provided in this chapter."

An emergency declaration is provided for to some extent in the Constitution of the State of Iowa in section 26 of Article III, which section provides that acts passed at a regular session of the General Assembly shall take effect on the 4th of July following, but it contains the further provision:

"If the General Assembly shall deem any law of immediate importance, they may provide that the same shall take effect by publication in newspapers in the State."

The uniform holding of the courts is that such declarations made under these provisions are binding upon the courts, they being legislative acts not subject to review by the courts. There is no other declaration provided for as to an emergency in the Constitution in reference to legislation. So any other emergency that the legislature may undertake to set up as the reason for passing any particular act, is subject, at least to a certain extent, to the review of the courts. It is also a fundamental principle that an emergency does not create power. It only gives the right to the exercise of power that already exists. It never gives the right to exercise the power forbidden by the Constitution. So the Constitution of the United States and that of the State of Iowa, each deny the power to enact laws of the nature involved herein, and are binding. The Congress can enact no law not authorized by the Constitution. The legislature of the State can enact no law forbidden by the State Constitution, or by the Federal Constitution. These provisions are universally accepted as the law. If the legislature can in defiance of the provisions of the Constitution enact one law and have it held valid by reason of a recitation of reasons therefor, in the nature of a declaration of emergency, then the legislature can enact any other law and have it held valid. Even conceding such power exists in the legislature there is no limit to where it can go. It seems to be the habit in many European countries and in that part of the New World south of the Rio Grande, for the executive and sometimes the legislative departments of government, to suspend the constitutional guaranties. That practice has never been recognized in the English speaking countries, and would be against the principles of Constitutional government as recognized and practiced here. When that is recognized and approved, Constitutional government is at an end. The remedy for the evil, if there is an evil, is to amend the Constitution.

We have a provision in our State Constitution for calling a Constitutional Convention on the vote of the people. It is Section 3 of Article X, as follows:

"Sec. 3. At the general election to be held in the year one thousand eight hundred and seventy, and in each tenth year

thereafter, and also at such times as the General Assembly may, by law, provide, the question, 'Shall there be a Convention to revise the Constitution, and amend the same?' shall be decided by the electors qualified to vote for members of the General Assembly; and in case a majority of the electors so qualified, voting at such election, for and against such proposition, shall decide in favor of a Convention for such purpose, the General Assembly, at its next session, shall provide by law for the election of delegates to such Convention.''

It will be observed that this section provides that each ten years after 1870, and also at such times as the legislature may by law provide, the question of calling a Convention shall be submitted to the electors. It is necessary at each ten-year election to submit this question, but the legislature may provide for submission at other times. It then provides in the case of an affirmative vote for calling a Convention, that the General Assembly at its next session shall provide by law for election of such delegates to the convention. This is a mandatory provision. The legislature of this State ignored the vote of the people of the State calling for a Constitutional Convention, as late as 1920, where the people voted to call a Constitutional Convention, and although the Constitution itself says in Section 3 of Article X, ''and in case a majority of the electors so qualified, voting at such election * * * shall decide in favor of a Convention for such purpose, the General Assembly, at its next session, shall provide by law for the election of delegates to such Convention.''

So here was a mandatory duty cast upon the legislature by the vote of the people of the State, Constitutionally expressed, that the legislature ignored. So if our Constitution is such that it should be amended to permit these things (if it were possible under the Federal Constitution so to do) the blame is not with the courts, but with the legislature. To admit that the legislature has the right to enact legislation forbidden by the Constitution and have it held valid by reason of some statement of an emergency, therefore binding upon the courts, is to throw away the Constitution, for if the legislature can ignore one provision of the Constitution it can ignore all. It could in such cases pass laws regimenting the people of the State. We see no reason why, if this power is to be conceded to the legislature, not subject to the decisions of the courts, the legislature might not possibly

adopt a declaration of emergency on account of disturbing matters of State, etc., that it would be harmful to hold a general election, therefore the next general election would not be held and the officers and members of the General Assembly would continue to hold their office until conditions were settled, and so have two years more. There would be no question but what such an act would be unconstitutional. But once concede the power to exist; to ignore the plain provisions of the Constitution and allow them to be set aside by a declaration of emergency, and have that binding, such a state of affairs might be possible. It may be fanciful, but possible.

To make sure that there could be no dodging of the fact that the Constitution of the State is in all parts of its acts supreme, it is provided in section 1 of Article XII,

"This Constitution shall be the supreme law of the State, and any law inconsistent therewith, shall be void. The General Assembly shall pass all laws necessary to carry this Constitution into effect."

Our Constitution makers wanted to make sure that this would be the rule adopted. It announced to the people, "We are turning the power of the State over to the legislature, but turning it over under the conditions named", and so when the legislature passes any act inimical to any section of the Constitution, that legislature is exceeding its power and its right, and is in the same position that any other agent would be, in exceeding power, i. e., have the act in excess of the power conferred declared void.

For the reasons set forth in this opinion we hold that the legislation in question, both of the State and the City of Des Moines, in regard to the attack herein, is void, is inimical to the Constitution, and that therefore the decision of the lower court should be reversed and the cause remanded with direction to enter a decree in conformance with this opinion. Or if the plaintiff so elects, decree may be taken in this court.—Reversed and remanded.

ALBERT, STIGER, RICHARDS, and KINTZINGER, JJ., concur.

DONEGAN, HAMILTON, and MITCHELL, JJ., specially concurring.

Mitchell, J. (specially concurring)—I concur in the result reached in the opinion but am unable to agree with much of the reasoning and many of the statements therein contained.

Great weight is placed in the opinion upon the case of Morehead v. New York ex rel. Tipaldo, 56 S. Ct. 918, 80 L. Ed. 1347, 103 A. L. R. 1445. This case involves the minimum wage law for women and minors, passed by the legislature of the State of New York. The majority opinion was written by Mr. Justice Butler and was joined in by four other members of the court. The dissenting opinion was written by Mr. Chief Justice Hughes and was joined in by three other members of the court. The reasoning and logic in the dissenting opinion appeal much more to me than does the reasoning in the majority opinion.

In the dissenting opinion Mr. Chief Justice Hughes said at pages 926, 927 of 56 S. Ct.:

"I can find nothing in the Federal. Constitution which denies to the State the power to protect women from being exploited by overreaching employers through the refusal of a fair wage as defined in the New York statute and ascertained in a reasonable manner by competent authority."

Again at pages 930, 931 of 56 S. Ct. he said:

"We have had frequent occasion to consider the limitations of liberty of contract. While it is highly important to preserve that liberty from arbitrary and capricious interference, it is also necessary to prevent its abuse, as otherwise it could be used to override all public interests and thus in the end destroy the very freedom of opportunity which it is designed to safeguard.

"We have repeatedly said that liberty of contract is a qualified and not an absolute right. 'There is no absolute freedom to do as one wills or to contract as one chooses. * * * Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community.' Chicago, B. & Q. R. Co. v. McGuire, 219 U. S. 549, 567, 55 L. Ed. 328, 338, 31 S. Ct. 259. The numerous restraints that have been sustained have often been recited. Id., p. 568. Nebbia v. New York, supra (291 U. S. 502, at pages 526-528, 78 L. Ed. 950, 951, 54 S. Ct. 505, 89 A. L. R. 1469). Thus we have upheld the limitation of hours of employment in mines and smelters (Holden v. Hardy, 169 U. S. 366, 42 L. Ed.

780, 18 S. Ct. 383) ; the requiring of redemption in cash of store orders or other evidences of indebtedness issued in payment of wages (Knoxville Iron Co. v. Harbison, 183 U. S. 13, 46 L. Ed. 55, 22 S. Ct. 1) ; the prohibition of contracts for options to sell or buy grain or other commodities at a future time (Booth v. Illinois, 184 U. S. 425, 46 L. Ed. 623, 22 S. Ct. 425) ; the forbidding of advance payments to seamen (Patterson v. The Eudora, 190 U. S. 169, 47 L. Ed. 1002, 23 S. Ct. 821) ; the prohibition of contracts to pay miners employed at quantity rates upon the basis of screened coal instead of the weight of the coal as originally produced in the mine (McLean v. Arkansas, 211 U. S. 539, 53 L. Ed. 315, 29 S. Ct. 206) ; the regulation of the size and weight of loaves of bread (Schmidinger v. Chicago, 226 U. S. 578, 57 L. Ed. 364, 33 S. Ct. 182, Ann. Cas. 1914B, 284; P. F. Peterson Baking Co. v. Bryan, 290 U. S. 570, 78 L. Ed. 505, 54 S. Ct. 277, 90 A. L. R. 1285) ; the regulation of insurance rates (German Alliance Ins. Co. v. Lewis, 233 U. S. 389, 58 L. Ed. 1011, 34 S. Ct. 612, L. R. A. 1915C, 1189; O'Gorman & Young vs. Hartford F. Ins. Co., 282 U. S. 251, 75 L. Ed. 324, 51 S. Ct. 130, 72 A. L. R. 1163, supra) ; the regulation of the size and character of packages in which goods are sold (Armour & Co. vs. North Dakota, 240 U. S. 510, 60 L. Ed. 771, 36 S. Ct. 440, Ann. Cas. 1916D, 548) ; the limitation of hours of employment in manufacturing establishments with a specified allowance of overtime payment (Bunting vs. Oregon, 243 U. S. 426, 61 L. Ed. 830, 37 S. Ct. 435, Ann. Cas. 1918A, 1043) ; the regulation of sales of stocks and bonds to prevent fraud (Hall vs. Geiger-Jones Co., 242 U. S. 539, 61 L. Ed. 480, 37 S. Ct. 217, L. R. A. 1917F, 514, Ann. Cas. 1917C, 643) ; the regulation of the price of milk (Nebbia v. New York, 291 U. S. 502, 78 L. Ed. 940, 54 S. Ct. 505, 89 A. L. R. 1469, supra). The test of validity is not artificial. It is whether the limitation upon the freedom of contract is arbitrary and capricious or one reasonably required in order appropriately to serve the public interest in the light of the particular conditions to which the power is addressed."

And at page 932 of 56 S. Ct.;

"If liberty of contract were viewed from the standpoint of absolute right, there would be as much to be said against a regulation of the hours of labor of women as against the fixing of a minimum wage. Restriction upon hours is a restriction upon

the making of contracts and upon earning power. But the right being a qualified one, we must apply in each case the test of reasonableness in the circumstances disclosed. Here, the special conditions calling for the protection of women, and for the protection of society itself, are abundantly shown. The legislation is not less in the interest of the community as a whole than in the interest of the women employees who are paid less than the value of their services. That lack must be made good out of the public purse. Granted that the burden of the support of women who do not receive a living wage cannot be transferred to employers who pay the equivalent of the service they obtain; there is no reason why the burden caused by the failure to pay that equivalent should not be placed upon those who create it. The fact that the State cannot secure the benefit to society of a living wage for women employees by any enactment which bears unreasonably upon employers does not preclude the State from seeking its objective by means entirely fair both to employers and the women employed.''

The logic of the above quotation appeals to me, but unfortunately it is from the dissenting opinion, which is not the law. To the dissenter is given the right to express his views, but when an opinion is adopted by a majority of the court—and it makes no difference whether that is a 5-4 decision or not—it becomes the law, regardless of what the dissenters may have to say, and we are bound to follow the opinion as adopted.

In the case at bar we are not confronted with a minimum wage statute, but rather with a price-fixing statute. It was no doubt the thought of the legislature that if the price of hair-cuts and shaves was fixed at a certain amount it would provide a fair, living wage for the barbers who did the work. But there is nothing in the statute that would compel the payment of reasonable wages to the barbers; it simply fixes the minimum charge that can be made for the work, and not the minimum wages that might be paid to those who do the work. The validity of the statute before us is much more doubtful than the validity of the legislation involved in the case of Morehead v. People. I see no way, therefore, of avoiding the conclusion that the statute involved in the case at bar is in violation of the Fourteenth Amendment of the Constitution of the United States.

DONEGAN, J. (specially concurring)—While I agree with the

result reached in the majority opinion, I am unable to agree with much of the reasoning and many of the statements contained in the discussion therein.

The majority opinion appears to be based largely upon the decisions reached by the Supreme Court of the United States in the cases of Adkins v. Children's Hospital, 261 U. S. 525, 43 S. Ct. 394, 67 L. Ed. 785, 24 A. L. R. 1238, and Morehead v. People ex rel. Tipaldo, 80 L. Ed. 1347, 56 S. Ct. 918, 103 A. L. R. 1445. The first of these cases involves the minimum wage law for women and children in the District of Columbia, passed by Congress, and was decided by the Supreme Court of the United States in 1923; while the second of these decisions involves the minimum wage law for women and children, passed by the legislature of the State of New York, and was decided on June 1st of this year. There were dissenting opinions in both of these cases. In Adkins v. Children's Hospital, the majority opinion was delivered by Mr. Justice Sutherland, and dissenting opinions were delivered by Mr. Chief Justice Taft and Mr. Justice Holmes. The dissenting opinion of Mr. Chief Justice Taft was concurred in by Mr. Justice Sanford. In the late case of Morehead v. People, the majority opinion was delivered by Mr. Justice Butler and dissenting opinions were delivered by Mr. Chief Justice Hughes and Mr. Justice Stone. Mr. Justice Brandeis, Mr. Justice Stone and Mr. Justice Cardozo concurred in the dissenting opinion of the Chief Justice, and Mr. Justice Brandeis and Mr. Justice Cardozo joined in the dissenting opinion of Mr. Justice Stone. It is quite apparent, therefore, that the conclusions reached in the majority opinions in these two cases were not so clearly supported by reasoning and precedent as to leave no doubt in regard to their correctness. These opinions, however, having been concurred in by a majority of the court, are the law of the land, and, the opinion in Morehead v. People having decided that the legislature of a state cannot validly legislate as to the matters involved in the statute passed in the State of New York, this opinion is binding upon the legislatures of all the states. I think it must be conceded that the validity of the legislation involved in the case at bar is much more doubtful than the validity of the legislation involved in Morehead v. People, and I see no way, therefore, of avoiding the conclusion that the act of the legislature involved in the case at

236

bar is in violation of Section 1 of the Fourteenth Amendment of the Constitution of the United States.

In so far, however, as the majority opinion in the case at bar seems to adopt the reasoning of the majority opinions in Adkins v. Children's Hospital and Morehead v. People, I cannot agree with much that is said therein. To my mind the dissenting opinions of Mr. Chief Justice Taft and of Mr. Justice Holmes in the Adkins case, and the dissenting opinions of Mr. Chief Justice Hughes and Mr. Justice Stone in the Morehead case, appeal as much more convincing than the majority opinions in these cases.

Therefore, while I do not concur in much of the reasoning and discussion of the majority opinion in the case at bar, I do concur in the result reached therein.

Justice Hamilton joins in the foregoing special concurrence.