STATE *v.* GREESON *et al.*

BOARD OF BARBER EXAMINERS *v.* MELTON *et al.*

(*Nashville*, December Term, 1938.)

Opinion filed Feb. 4, 1939.

W. C. CHERRY, of Nashville, and CHAS. M. BRYAN, of Memphis, for Board of Barber Examiners.

JESSE CANTRELL, of Watertown, and T. B. FINLEY, of Lebanon, for Melton *et al.*

FRANK S. DARWIN, Assistant District Attorney-General,

and NAT TIPTON, Assistant State Attorney-General,[*] for the State.

H. W. SCHOOLFIELD, of Chattanooga, for Greeson, *et al.*

MR. JUSTICE McKINNEY delivered the opinion of the Court.

These cases involve the authority of the State Board of Barber Examiners (1) to fix prices of barber work in the several counties of the State, and (2) to fix the hours that barber shops may be operated.

In the Hamilton County case the defendants were severally presented for cutting hair at a price lower than that fixed by the Board. The trial court held the Act under which the Board was proceeding invalid and quashed the presentments. The State appealed.

In the Davidson County cause the chancellor sustained the authority of the Board to fix the prices of barber work, but held its order designating opening and closing hours invalid. Both the Board and the defendant barbers have appealed to this court and assigned errors.

By Chapter 118, Public Acts 1929, Code, sections 7117-7139, a Board of Barber Examiners was created with power to license applicants to practice the trade of barbering, and to regulate the operation of such shops with a view of conserving the health and safety of their patrons. Violation of its provisions is made a misdemeanor, punishable by a fine of not less than $25 nor more than $200. This Act will be referred to later in more detail.

By Chapter 236, Public Acts 1937, the Legislature fur-

---

*The Assistant State Attorney-General was of the opinion that the Barber Act is unconstitutional and filed a brief as *amicus curiae* in support of this position.

ther enlarged "the present powers" of the Board of Barber Examiners, the principal extension being the authority to fix prices for barber work in the several counties of the State as set forth in section 12 thereof, which is as follows:

"(a) That the Board shall have the power to approve price agreements establishing minimum prices for barber work, signed, and submitted by any organized groups of at least 75% of the barbers of each county, after ascertaining by such investigations, and proofs as the condition permits and requires, that such price agreement is just, and under varying conditions, will best protect the public health and safety by affording a sufficient minimum price for barber work to enable the barbers to furnish modern and healthful services and appliances, so as to minimize the danger to the public health incident to such work.

"The Board shall take into consideration all conditions affecting the barber profession in its relation to the public health and safety.

"In determining reasonable minimum prices, the Board shall take into consideration the necessary costs incurred in the particular county maintaining a barber shop in a clean, healthful and sanitary condition.

"(b) The Board, after making such investigation, shall fix by official order, the minimum price for all work usually performed in a barber shop.

"(c) That if the Board after investigation, make either upon its own initiative, or upon the complaint of a representative group of barbers, determines that the minimum prices so fixed are insufficient to properly provide healthful services to the public and keep the shops sanitary, then the Board from time to time shall have

authority to vary or refix the minimum prices for a barber's work in each county.''

Pursuant to the authority thus vested, the Board, upon application of 75 per cent of the barbers in Davidson and Hamilton Counties, promulgated a schedule of charges applicable to those counties, which certain members of the trade disregarded.

It may be stated, preliminarily, that the first section of the 1937 Act declares that an emergency exists; that on account of unfair competition in the operation of barber shops and economic conditions affecting barbers the public health and safety are endangered, necessitating the immediate enforcement of the Act. Upon this question the Supreme Court of Iowa, in considering a similar provision in an act passed by the Legislature of that State in 1935, in *Duncan* v. *City of Des Moines*, 222 Iowa, 218, 268 N. W., 547, 552, said: ''So any other emergency that the Legislature may undertake to set up as the reason for passing any particular act is subject, at least to a certain extent, to the review of the courts. It is also a fundamental principle that an emergency does not create power. It only gives the right to the exercise of power that already exists. It never gives the right to exercise the power forbidden by the Constitution. . . . If the Legislature can in defiance of the provisions of the Constitution enact one law and have it held valid by reason of a recitation of reasons therefor, in the nature of a declaration of emergency, then the Legislature can enact any other law and have it held valid. . . . To admit that the Legislature has the right to enact legislation forbidden by the Constitution and have it held valid by reason of some statement of an emergency, therefore binding upon the courts, is to throw away the Con-

stitution, for if the Legislature can ignore one provision of the Constitution it can ignore all.''

On the point of a prevailing emergency as the basis for unusual legislation, the Supreme Court of the United States, in the case of *Schechter* v. *United States*, 295 U. S., 495, 55 S. Ct., 837, 842, 79 L. Ed., 1570, 97 A. L. R., 947, said: ''We are told that the provision of the statute authorizing the adoption of codes must be viewed in the light of the grave national crisis with which Congress was confronted. Undoubtedly the conditions to which power is addressed are always to be considered when the exercise of power is challenged. Extraordinary conditions may call for extraordinary remedies. But the argument necessarily stops short of an attempt to justify action which lies outside the sphere of constitutional authority. Etraordinary conditions do not create or enlarge constitutional power.''

And in the still later case of *United States* v. *Butler*, 297 U. S., 1, 56 S. Ct., 312, 323, 80 L. Ed., 477, 102 A. L. R., 914, the court stated: ''It does not help to declare that local conditions throughout the nation have created a situation of national concern; for this is but to say that whenever there is a widespread similarity of local conditions, Congress may ignore constitutional limitations upon its own powers and usurp those reserved to the States.''

The right of the State, under its police power, to regulate barbers is firmly established. It was so held by this court in *State ex rel. Melton* v. *Nolan*, 161 Tenn., 293, 30 S. W. (2d), 601, in which Chapter 118, Acts 1929, was sustained as a valid exercise of such power. Numerous cases recognizing such right will be found listed in the annotation in 98 A. L. R., 1089. This right, how-

ever, is not absolute, but one that must be exercised in a reasonable manner and so as not to interfere with private rights. *Meyer* v. *Nebraska*, 262 U. S., 390, 43 S. Ct., 625, 67 L. Ed., 1042, 29 A. L. R., 1446; *Campbell* v. *McIntyre*, 165 Tenn., 47, 52 S. W. (2d), 162.

On the other hand, the Constitution guarantees to the individual personal liberty, the right to acquire, hold and dispose of property, and the right to contract with respect to his labor. In *Lochner* v. *New York*, 198 U. S., 45, 25 S. Ct., 539, 541, 49 L. Ed., 937, 3 Ann. Cas. 1133, the court said: "The general right to make a contract in relation to his business is part of the liberty of the individual protected by the 14th Amendment of the Federal Constitution. *Allgeyer* v. *Louisiana*, 165 U. S., 578, 17 S. Ct., 427, 41 L. Ed., 832. Under that provision no State can deprive any person of life, liberty or property without due process of law. The right to purchase or to sell labor is part of the liberty protected by this amendment, unless there are circumstances which exclude the right. There are, however, certain powers, existing in the sovereignty of each State in the Union, somewhat vaguely termed police powers, the exact description and limitation of which have not been attempted by the courts. Those powers, broadly stated, and without, at present, any attempt at a more specific limitation, relate to the safety, health, morals, and general welfare of the public. Both property and liberty are held on such reasonable conditions as may be imposed by the governing power of the State in the exercise of those powers, and with such conditions the 14th Amendment was not designed to interfere."

With reference to the 14th Amendment U. S. Const., the court, in *Adair* v. *United States*, 208 U. S., 161, 28

S. Ct., 277, 279, 52 L. Ed., 436, 13 Ann. Cas., 764, made this statement:

"The first inquiry is whether the part of the 10th section of the act of 1898 upon which the first count of the indictment was based is repugnant to the 5th Amendment of the Constitution declaring that no person shall be deprived of liberty or property without due process of law. In our opinion that section, in the particular mentioned, is an invasion of the personal liberty, as well as of the right of property, guaranteed by that Amendment. Such liberty and right embrace the right to make contracts for the purchase of the labor of others, and equally the right to make contracts for sale of one's own labor; each right, however, being subject to the fundamental condition that no contract, whatever its subject-matter, can be sustained which the law, upon reasonable grounds, forbids as inconsistent with the public interests, or as hurtful to the public order, or as detrimental to the common good."

In that case the court also quoted approvingly from *Lochner* v. *New York, supra,* as follows: "In every case that comes before this court, therefore, where legislation of this character is concerned, and where the protection of the Federal Constitution is sought, the question necessarily arises: Is this a fair, reasonable, and appropriate exercise of the police power of the State, or is it an unreasonable, unnecessary, and arbitrary interference with the right of the individual to his personal liberty or to enter into those contracts in relation to labor which may seem to him appropriate or necessary for the support of himself and his family?"

In *Meyer* v. *Nebraska,* 262 U. S., 390, 43 S. Ct., 625, 626, 67 L. Ed., 1042, 29 A. L. R., 1446, it was said:

"While this court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration, and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally, to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by freemen." (Citing numerous authorities.)

Thus, as stated in *Lochner* v. *New York, supra*: "It is a question of which of two powers or rights shall prevail—the power of the State to legislate or the right of the individual to liberty of person and freedom of contract." And, as previously stated, the latter must give way to the former where it appears that the enactment has for its object the preservation of the public health, safety, morals, or general welfare, or where there is some clear, real, and substantial connection between the assumed purpose of the enactment and the actual provisions thereof, and that the latter do in some plain, appreciable, and appropriate manner tend toward the accomplishment of the object for which the power is exercised. 12 C. J., 929.

Applying the foregoing fundamental principles of our organic law to the Act before us, we are unable to see that the public good would be benefited by its enforcement. In other words, the public health and general welfare of the patrons of these shops is fully protected by the Act of 1929, which creates a Board with authority

to (a) license applicants who are qualified and who are of good moral character and temperate habits; (b) make reasonable rules and regulations for carrying into effect the provisions of the Act; (c) revoke the certificate and suspend any barber for the following causes:

"1. Conviction of a felony shown by a certified copy of the record of the Court of Conviction.

"2. Gross malpractice or gross incompetency;

"3. Continued practice by a person knowingly having an infectious or contagious disease;

"4. Advertising by means of knowingly false or deceptive statements;

"5. Advertising practicing or attempting to practice under a trade name or other than one's own name;

"6. Habitual drunkenness or habitual addiction to the use of morphiben cocaine or other habit-forming drugs;

"7. Immoral or unprofessional conduct; and

"8. The commission of any of the offenses described in section 17, subdivisions 3, 4, and 6;"

(d) prescribe sanitary requirements for barber shops; and (e) employ inspectors to see that the sanitary requirements are complied with.

This class of legislation, that is, fixing prices, is new and likely resulted from the decision of the Supreme Court of the United States in *Nebbia* v. *New York*, 291 U. S., 502, 54 S. Ct., 505, 78 L. Ed., 940, 89 A. L. R., 1469, decided March 5, 1934, in which the court sustained a statute fixing the price of milk in New York. A dissenting opinion was filed in that case, concurred in by four members of the court. The various acts fixing prices to be charged by barbers, to which our attention has been directed, were passed since the decision was

rendered in the *Nebbia Case*. In *Duncan* v. *City of Des Moines*, 222 Iowa, 218, 268 N. W., 547, decided July 31, 1936, the court had under consideration an act similar to ours passed in 1935, which the court, in a unanimous opinion, held invalid as violative of the personal liberty of the citizen. It is true, however, that the decision in that case was based largely upon the opinion of the United States Supreme Court in the case of *Adkins* v. *Children's Hospital*, 261 U. S., 525, 43 S. Ct., 394, 67 L. Ed., 785, 24 A. L. R., 1238, which authority was expressly overruled in a five-to-four decision in *West Coast Hotel Company* v. *Parrish*, 300 U. S., 379, 57 S. Ct., 578, 81 L. Ed., 707, 108 A. L. R., 1330, decided March 29, 1937. In that case it was held that the State statute authorizing the fixing of reasonable, minimum wages for women and minors in any industry or occupation within the State of Washington was not repugnant to the due process clause of the Federal Constitution.

At this point it may be well to note that the Act here involved does not fix the wages that employees of barber shops are to receive, but simply authorizes a schedule of prices which the proprietor may charge his customers; and the money so received by him may be disposed of as he sees fit, since this feature of the Act bears no relation to his employees or to the character of shop he is to maintain.

The Legislature of Florida passed an act similar to ours in 1935. On March 16, 1936, the Supreme Court of that State in a four-to-two decision in *State ex rel. Fulton* v. *Ives*, 123 Fla., 401, 167 So., 394, declared the act unconstitutional as a denial of equal protection, due process of law, and improper restraint on freedom of contract.

In *Mobile* v. *Rouse*, 233 Ala., 622, 173 So., 266, 111 A. L. R., 349, the Supreme Court in a six-to-one decision held an act similar to ours unconstitutional because not affected with a public interest. The opinion in that case was rendered on March 18, 1937. In the opinion the court distinguished its decision in *Franklin* v. *State*, 232 Ala., 637, 169 So., 295, on the ground that the milk industry, as held in the *Nebbia Case*, was affected with a public interest.

*Board of Barber Examiners of Louisiana* v. *Parker*, 190 La., 214, 182 So., 485, 512, involved an act almost identical with ours, which was passed by the Legislature in 1936. In an opinion filed on March 7, 1938, the Supreme Court of Louisiana in a four-to-three decision held the act invalid. In response to a petition to rehear, that court, on March 30, 1938, in a five-to-two decision reversed its former holding and, primarily upon its interpretation of the *Nebbia Case,* held the act valid. Chief Justice O'NEILL filed a dissenting opinion, from which we quote the following:

"The only question in these cases is whether a statute authorizing a public board to fix the minimum fees that a barber may charge for his services really tends to protect the public health. It is not disputed that the barbers' trade is one which may endanger the public health, and which is therefore subject to regulation by the Legislature. But I do not see how an act of the Legislature prescribing the minimum fees—or delegating to a public board·the authority to prescribe the minimum fees— that a barber may charge for his services can protect, or have a tendency to protect, the public health. The only appropriate way in which the Legislature can protect the public health, or promote the public welfare, in that

respect, is to establish sanitary requirements and regulations, to maintain cleanliness in the barber shops, and to guard against unhealthy barbers, to prescribe qualifications and standards of efficiency, and to enforce them by means of examinations, or by requiring terms of apprenticeship. If a barber complies with all of the requirements of efficiency, and all of the sanitary regulations, as laid down by the Board of Health or by the Board of Barber Examiners, it cannot possibly endanger the public health or the public welfare. . . .

"I do not consider the decision rendered by the Supreme Court of the United States in the case of *Nebbia* v. *New York*, which is quoted so abundantly in the prevailing opinion in this case, as being appropriate to this case. In the *Nebbia Case* the court held that a New York statute fixing the retail price of milk was not violative of the Fourteenth Amendment. But the reason for the decision was said to be that the price-cutting by the competitors in the milk business was producing waste, harmful to the public, was threatening ultimately to cut off the supply of milk, and to destroy the industry itself, and thus to affect most disastrously the public welfare. There is nothing like that in this case."

The decisions in the Alabama, Florida and Iowa Cases, as well as the minority opinion in the Louisiana Case, are rested upon the theory that the involved statutes are not regulatory but price-fixing measures, which have no real or substantial relation to the public health, safety, or welfare, and are distinguishable from the *Nebbia Case* for the reasons heretofore pointed out. In our opinion the distinction is well taken, particularly in view of the requirements of the 1929 Act which adequately and fully protect the public health and safety.

If the Act in question is valid, then the Legislature can directly, or through a board, fix the fees that physicians and dentists may charge for their services; the prices that hotels, restaurants and lunch counters may charge for food; the prices of meats, packing house and canning factory products; and so on *ad infinitum* until the liberty of the individual and the right to contract is destroyed. As stated by the Supreme Court of the United States in *Lochner* v. *New York, supra*:

"It must, of course, be conceded that there is a limit to the valid exercise of the police power by the State. There is no dispute concerning this general proposition. Otherwise the 14th Amendment would have no efficacy and the legislatures of the States would have unbounded power, and it would be enough to say that any piece of legislation was enacted to conserve the morals, the health, or the safety of the people; such legislation would be valid, no matter how absolutely without foundation the claim might be. The claim of the police power would be a mere pretext—become another and delusive name for the supreme sovereignty of the State to be exercised free from constitutional restraint."

We conclude, therefore, that Chapter 236, Public Acts 1937, is invalid because violative of the 5th and 14th Amendments of the Federal Constitution, and Article 1, section 8, and Article 11, section 8, of the Constitution of Tennessee.

 The Board of Barber Examiners issued the following order:

"Opening and closing of all barber shops in Davidson County, Open 7:00 A. M., Close 7:00 P. M., Saturdays, open 7:00 A. M., close 9:00 P. M. All shops will be closed the following holidays:

"July 4th
"Labor Day
"Thanksgiving
"Christmas"

Neither the Act of 1929 nor that of 1937 expressly authorizes the Board of Barber Examiners to designate opening and closing hours for conducting the business of barbering. Even had such authority been expressly conferred, we think it would be an unreasonable and unnecessary exercise of the police power. The following cases so hold: *Charles* v. *Atlanta*, 164 Ga., 755, 139 S. E., 559, 55 A. L. R., 230; *McDermott* v. *City of Seattle*, (D. C.), 4 F. Sup., 855; *City of Alexandria* v. *Hall*, 171 La., 595, 131 So., 722; *Knight* v. *Johns*, 161 Miss., 519, 137 So., 509; *State* v. *City of Laramie*, 40 Wyo., 74, 275 P., 106; *Patton* v. *City of Bellingham*, 179 Wash., 566, 38 P. (2d), 364, 98 A. L. R., 1076; *Ganley* v. *Claeys*, 2 Cal. (2d), 266, 40 P. (2d), 817; *State* v. *Johannes*, 194 Minn., 10, 259 N. W., 537; *Ex Parte Jentzsch*, 112 Cal., 468, 44 P., 803, 32 L. R. A., 664. The reason for holding such requirements invalid is stated in the first-named case, as follows:

"Persons engaged in the operation of barber shops are carrying on a perfectly lawful business. It is not, in any sense of the word, a noxious business. In fact, the business may be regarded as indispensable in the present development of our civilization, if we have regard to the requirements of decency and cleanliness. There is ample evidence in the record to show that if the barber shops are closed at 7 o'clock in the evening and not permitted to open until next morning, there will be a large and numerous class of citizens, both white and colored, who cannot avail themselves of the service of barbers. It is

shown that certain mercantile establishments, having in their service numerous employees, require the attendance of those employees until a later hour than that at which the barber shops under this ordinance would be required to close. And in addition to this, those engaged in domestic service and in the various branches of such service are detained in the discharge of their duties in this employment to an hour that would prevent their availing themselves of the service rendered in barber shops, if such shops are closed at the hour of 7 o'clock. The section of the ordinance with which we are now dealing is therefore void, as being unreasonable, upon the grounds which we have stated above, and other grounds could be adduced if necessary. And it is discriminatory, because it selects one particular lawful business that is in no wise noxious, and requires those operating this business to close at a very early hour, but leaves unregulated as to hours of closing various other businesses." [164 Ga., 755, 139 S. E., 561.]

We have been cited to no authority taking a contrary view.

It results that the judgments in the Hamilton County Case will be affirmed. So much of the decree of the chancellor in the Davidson County Cause as holds section 12, Chapter 236, Public Acts 1937, valid will be reversed. The Board of Barber Examiners will be taxed with the costs in the latter cause, and in the former case the costs will be certified for payment by the State.