10 So.2d 461

### STATE v. POLAKOW'S REALTY EXPERTS, Inc.

### SAME v. STRUMPF.

#### 6 Div. 18, 22.

Supreme Court of Alabama.

Oct. 22, 1942.

Rehearing Denied Nov. 19, 1942.

Thos. S. Lawson, Atty. Gen., and Clarence M. Small, Asst. Atty. Gen., for appellant.

Horace C. Wilkinson, of Birmingham, for appellees.

GARDNER, Chief Justice.

We are asked by appellees to strike down Chapter 14, Title 46, Code 1940, originally enacted in 1927, Gen.Acts 1927 p. 335, as in contravention of both the State and Federal Constitutions. The argument, which found favor in the Court below, is based in part upon the theory that the right to earn a livelihood by following the ordinary occupations of life is a fundamental, natural, inherent and inalienable right, sacred and valuable, and fully protected by our fundamental laws.

 This principle is of course well supported by the authorities and not here denied. 11 Amer.Jur. Sec. 336. And it must be conceded also that "the common businesses and callings of life, the ordinary trades and pursuits which are innocent in themselves and which have been followed in all communities from time immemorial must, therefore, be free in the United States to all alike upon the same terms". 11 Amer.Jur. Sec. 336.

 But this universal right is subject to the paramount right of the government as a part of the police power to impose such restrictions as the protection of the public may require. "The right of reasonable regulation is a modification of the sweeping generalization that every person has a right to pursue any lawful calling." 11 Amer.Jur. Sec. 337. Counsel for appellee concedes in effect the correctness of this principle, but insists that the real estate business is innocent and harmless and not subject to the police power of the State and that any regulatory enactment is founded upon no reasonable basis and is of consequence but an arbitrary exercise of legislative power subject to be condemned by the Courts. 11 Amer.Jur. Section 337.

The essential details of the Statute here under review appear in the opinion of Mr. Justice BROWN and need no repetition here. We would only add thereto some emphasis upon Section 306, Title 46, Code 1940, which has full provisions for a hearing before the commission with compulsory attendance of witnesses. Appellees do not question full protection in this respect, but base their argument upon the theory this real estate business is not subject to legislative regulation.

In support of their insistence we are cited to only one authority which is directly in point, that of the Court of Appeals of Kentucky in Rawles v. Jenkins, 212 Ky. 287, 279 S.W. 350, decided in 1925, wherein the case of Hoblitzel v. Jenkins, 204 Ky. 122, 263 S.W. 764, was overruled, which latter decision was rendered by a unanimous Court only the year previous.

Mr. Justice BROWN in his opinion appears to consider that the Courts of North Carolina and Delaware have ruled in accordance with the Kentucky Court of Appeals in Rawles v. Jenkins, supra. But this is an error. The Supreme Court of North Carolina by a sharply divided Court in State v. Dixon, 215 N.C. 161, 1 S.E.2d 521, invalidated a similiar law upon the ground that it violated the State Constitution as a local law and left untouched the

question here considered. The Delaware decision in Becker v. State, 7 W.W.Harr. 454, 185 A. 92, 93, as well as the North Carolina case of State v. Harris, 216 N. C. 746, 6 S.E.2d 854, 128 A.L.R. 658, dealt with regulatory statutes concerning an entirely different business with which we are not here concerned.

This observation is likewise applicable to other authorities cited by appellees, among them; Adams v. Tanner, 244 U.S. 590, 37 S.Ct. 662, 61 L.Ed. 1336, L.R.A. 1917F, 1163, Ann.Cas.1917D, 973; Kent Stores v. Wilentz, D.C., 14 F.Supp. 1; Ribnik v. McBride, 277 U.S. 350, 48 S.Ct. 545, 72 L.Ed. 913, 56 A.L.R. 1327; Wolff Packing Co. v. Court of Industrial Relations, 262 U.S. 522, 43 S.Ct. 630, 67 L.Ed. 1103, 27 A.L.R. 1280; Duncan v. City of Des Moines, 222 Iowa 218, 268 N.W. 547; Buehman v. Bechtel, 57 Ariz. 363, 114 P.2d 227, 134 A.L.R. 1374; Bramley v. State, 187 Ga. 826, 2 S.E.2d 647; Richardson v. Coker, 188 Ga. 170, 3 S.E.2d 636; People v. Warden of City Prison, 144 N.Y. 529, 39 N.E. 686, 27 L.R.A. 718; State v. Smith, 42 Wash. 237, 84 P. 851, 5 L.R.A.,N.S., 674, 114 Am.St.Rep. 114, 7 Ann.Cas. 577; New State Ice Co. v. Liebmann, 285 U.S. 262, 52 S.Ct. 371, 76 L.Ed. 747; Williams v. Standard Oil Co., 278 U.S. 235, 49 S.Ct. 115, 73 L.Ed. 287, 60 A.L.R. 596; Replogle v. City of Little Rock, 166 Ark. 617, 267 S. W. 353, 36 A.L.R. 1333.

Reduced, therefore, to the last analysis, so far as authorities are concerned, appellees' insistence is supported only by the Kentucky case of Rawles v. Jenkins, supra. Such is the result of our own investigation as well as the ingenuity and resourcefulness of able and energetic counsel. Of course the mere fact that the Kentucky case stands alone, and as opposed to several other Courts of wide repute, does not suffice as a reason to cast that decision aside. But when we consider the guiding rule as here often stated that the Courts must first be convinced beyond all reasonable doubt that a legislative Act is violative of the Constitution, the decided weight of authority as thus outlined must suffice to give us pause.

We have often adverted to the duty resting upon the Court in questions of this character, more recently in State v. Murphy, 237 Ala. 332, 186 So. 487, 489, 121 A.L.R. 283, wherein it was observed:

"The courts, in the exercise of their power to annul a statute which contravenes the organic law, have uniformly recognized that the power is a delicate one, and to be used with great caution. And it must be borne in mind also that legislative power is not derived from either the State or Federal Constitution. These are only limitations upon power. Apart from the limitations imposed by these fundamental charters of government, the power of the legislature has no bounds, and is as plenary as that of the British Parliament.

"Or to state it differently, all that the legislature is not forbidden to do by the organic law, state or federal, it has full competency to do. And in passing upon the constitutionality of a legislative act, the courts uniformly approach the question with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a co-ordinate branch of the government. All of which is embraced in the simple statement that it is the recognized duty of the court to sustain the act unless it is clear beyond a reasonable doubt that it is violative of the fundamental law."

Counsel for appellees insist "this legislation is typical pressure group legislation", and inform us in brief that in response to such continuous pressure, beginning in 1919 with the National Association of Real Estate Boards, some thirty-three States have enacted regulatory legislation similar to that embraced in our Act of 1927. Of course there is nothing appearing upon the face of this Act suggesting that it was the result of any "pressure group" or that it was not passed by the lawmakers in entire good faith and in the public interest as they so viewed it.

In a number of instances litigation has arisen assailing the constitutionality of such legislation upon the grounds here urged upon us. And with the single exception of the Kentucky case above noted, these Courts have rejected the argument that the lawmakers have no authority to pass such regulatory statutes.

One of the earlier decisions (1919) was by the Supreme Court of California in Riley v. Chambers, 181 Cal. 589, 185 P. 855, 856, 8 A.L.R. 418, which contains a clear statement of the question presented and the conclusion reached as will appear from the following:

"Such being the general scope and outline of the act, a number of objections are made to it. The most important of these

446

is that the act is an unreasonable interference with the right of every citizen to engage in a legitimate and useful occupation. This objection is fundamental, and, if sound, the whole act falls, since its sole primary purpose is to hedge about the pursuit of the vocation of a real estate broker or salesman with certain restrictions. That such vocation is a legitimate and useful one cannot be controverted. Nor can it be controverted that the right to engage in a lawful and useful occupation cannot, in effect, be taken away under the guise of regulation. On the other hand, it is equally true that a lawful and useful occupation may be subjected to regulation in the public interest, and that all regulation involves in some degree a limitation upon the exercise of the right regulated. The test is whether or not the limitation imposed is really by way of regulation only; is one whose purpose and effect go no further than throwing reasonable safeguards in the public interest around the exercise of the right. If the limitation is of this character, its imposition is a proper exercise of the police power resident in the Legislature, and whose exercise is one of the latter's most important functions.

"Now, the single primary purpose of the act is to require of real estate brokers and salesmen that they be 'honest, truthful and of good reputation.' All of its provisions, including the requirements of a license, are but incidental to this single purpose and designed to accomplish it. * * *

"Where the occupation is one wherein those following it act as the agents and representatives of others and in a more or less confidential and fiduciary capacity, it certainly can be fairly said that those pursuing it should have in a particular degree the qualifications of 'honesty, truthfulness and good reputation.' The occupation of a real estate agent is of just this sort. He acts for others and in a more or less confidential and fiduciary capacity. As a result there is particularly required of him for the proper discharge of his duties honesty and truthfulness, and the Legislature has the right to require some assurance of their possession by every one following the occupation. One strong assurance of their possession is a good reputation."

Likewise the State of Tennessee at an early date (1921) passed a similar Act which was attacked upon constitutional grounds in the federal court. This litigation reached the Supreme Court of the United States. Bratton v. Chandler, 260 U.S. 110, 43 S.Ct. 43, 67 L.Ed. 157.

Though the particular argument here presented does not appear to have been pressed upon the Court in that case, yet we think when the entire opinion is read the conclusion must be reached that the members of the Court had in mind all questions presented by a consideration of the Fourteenth amendment and the decision upholding what is known as the Blue Sky Laws in Hall v. Geiger-Jones Co., 242 U.S. 539, 37 S.Ct. 217, 61 L.Ed. 480, L.R.A. 1917F, 514, Ann.Cas.1917C, 643, Note 87 A.L.R. 42, 43 et seq., wherein the court concludes by saying [260 U.S. 110, 43 S.Ct. 44, 67 L.Ed. 157]: "And the act construed as we construe it, will take no power from the commission necessary to the performance of its duties, and will leave no power with it that it can exercise to the detriment of any right assured to an applicant for a license by the Constitution of the United States."

And in 1925 the Supreme Court of Louisiana in Zerlin v. Louisiana Real Estate Board, 158 La. 111, 103 So. 528, 531, in a well considered opinion upheld a similar law and cited approvingly the California Riley case, supra, as well as the Bratton case from the United States Supreme Court. Says the Louisiana Court after full discussion: "That the statute comes within the legitimate exercise of the police power of the state we entertain no doubt".

Without intending any invidious comparison, we think perhaps the outstanding opinion from the standpoint of logic is to be found in that of Mr. Justice Cardozo writing for the Court of Appeals of New York in Roman v. Lobe, reported in 243 N.Y. 51, 152 N.E. 461, 462, 50 A.L.R. 1329. The view we entertain is therein well expressed in the following excerpts from that opinion:

"The Legislature has a wide discretion in determining whether a business or occupation shall be barred to the dishonest or incompetent. * * * Callings, it is said, there are so inveterate and basic, so elementary and innocent, that they must be left open to all alike, whether virtuous or vicious. If this be assumed, that of broker is not one of them. The intrinsic nature of the business combines with practice and tradition to attest the need of regulation. The real estate broker is brought

by his calling into a relation of trust and confidence. Constant are the opportunities by concealment and collusion to extract illicit gains. We know from our judicial records that the opportunities have not been lost. With temptation so aggressive, the dishonest or untrustworthy may not reasonably complain if they are told to stand aside. Less obtrusive, but not negligible, are the perils of incompetence. The safeguards against incompetence need not long detain us, for they were added to the statute after the services were rendered. We recall them at this time for the light that they cast upon the Legislature's conception of the mischief to be remedied. The broker should know his duty. To that end, he should have 'a general and fair understanding of the obligations between principal and agent.' Section 441, as amended by Laws 1924, c. 579. Disloyalty may have its origin in ignorance as well as fraud. He should know, so the Legislature has said (Laws 1924, c. 579), what is meant by a deed or a lease or a mortgage. At any moment he may have to make report as to such matters to expectant buyers or lessees. Often he goes farther, perhaps too far, and prepares a memorandum of the contract. He is accredited by his calling in the minds of the inexperienced or the ignorant with a knowledge greater than their own.

"The Legislatures of many states, awaking to these evils, have adopted statutes like to ours. Licenses to be issued after suitable inquiry as to character and competence are required in California (Laws 1919, p. 1252), Tennessee (Laws 1921, c. 98), Kentucky (Laws 1924, c. 138), Virginia (Laws 1924, c. 461; Virginia Code § 4359 [77]), New Jersey (Laws 1921, c. 141), Louisiana (Act No. 236 of 1920), Idaho (Laws 1921, c. 184), Illinois (Laws 1921, p. 153), Michigan (Laws 1921, c. 387), Montana (Rev.Code 1921, § 4065), Oregon (Laws 1921, c. 223), Wisconsin (Stat.1923, § 136.01), and Wyoming (Laws 1921, c. 31). Legislation so general marks a rising tide of opinion which is suggestive and informing. Klein v. Maravelas, 219 N.Y. 383, 385, 114 N.E. 809, L.R.A.1917E, 549, Ann.Cas.1917B, 273. The Supreme Court of California in a careful judgment upheld the act adopted in that state. Riley v. Chambers, 181 Cal. 589, 185 P. 855, 8 A.L.R. 418. The ruling there made was approved and followed by the Supreme Court of Louisiana. Zerlin v. Louisiana Real Estate Board, 158 La. 111, 103 So. 528. In accord also is the Supreme Court of Wisconsin. Payne v. Volkman, 183 Wis. 412, 198 N.W. 438. The Court of Appeals of Kentucky at first upheld the Kentucky act (Hoblitzel v. Jenkins, 204 Ky. 122, 263 S. W. 764), but afterwards condemned it (Rawles v. Jenkins, 212 Ky. 287, 279 S.W. 350). A like statute of Tennessee was before the Supreme Court of the United States in Bratton v. Chandler, 260 U.S. 110, 43 S.Ct. 43, 67 L.Ed. 157. By dictum and manifest implication, if not by necessary decision, the statute was sustained. Valid by the judgment of the same court are statutes for the licensing of dealers in securities (Hall v. Geiger-Jones Co., 242 U.S. 539, 37 S.Ct. 217, 61 L.Ed. 480 [L.R.A. 1917F, 514], Ann.Cas.1917C, 643. * * *

"One searches vainly for any adequate distinction in respect of legislative control between one broker and another.

"Significant, also, is the argument from history. For the better part of a century, real estate brokers in many states, even though not subjected to a test of character and competence, have been prohibited from doing business without a preliminary license. The validity of these requirements has been uniformly upheld. Decisions enforcing them will be found in the federal courts (Bradley v. City of Richmond, 227 U.S. 477, 480, 33 S.Ct. 318, 57 L.Ed. 603 [604], in Illinois (Braun v. Chicago, 110 Ill. 186), in Pennsylvania (Luce v. Cook, 227 Pa. 224, 75 A. 1098), in Minnesota (Buckley v. Humason, 50 Minn. 195, 52 N. W. 385, 16 L.R.A. 423, 36 Am.St.Rep. 637), and in Arkansas (City of Little Rock v. Barton, 33 Ark. 436). Such forms of regulation are less drastic, indeed, than the system now in question. They have significance, none the less, in marking off the business of the broker as distinct from occupations which by general acquiescence are pursued of common right without regulation or restriction. 'We do not readily overturn the settled practice of the years.' * * *

"The case circumscribes the judgment. We hold that the Legislature acts within its lawful powers when it establishes a system of licenses for real estate brokers with annual renewals."

And the statute now being considered has been twice before our own Court. True its constitutionality was not questioned, and its validity merely assumed. Knight

448

v. Watson, 221 Ala. 69, 127 So. 841; Marx v. Lining, 231 Ala. 445, 165 So. 207, 210.

In the latter case it was said: "In the case of Knight v. Watson, 221 Ala. 69, 127 So. 841, the above-mentioned act came under review in this court. In that case we held that this act was not designed to impose a license tax as a revenue measure merely, but was designed to regulate the business of brokers and real estate salesmen, to protect the public against fraud and imposition, requiring a license as evidence of qualification and fitness; and that the act came under the police power of the state. We further held that an unlicensed real estate broker or salesman could not sue and recover commissions for the sale of land under a contract with the owner. We reached this conclusion upon the ground that, in acting as such unlicensed broker or salesman, the plaintiff broker had violated section 1 of the Act, which made it a misdemeanor to engage in such business without first having obtained the required license."

These authorities are not cited in support of the constitutionality of the act, as the question was not presented. But considering the fact the court must here be convinced beyond a reasonable doubt, the reference in the opinions to the exercise of the police power and the assumption of the validity of the act are matters not to be entirely ignored. See also Blan v. Hollywood Realty Co., 22 Ala.App. 537, 118 So. 253; and Id., 22 Ala.App. 537, 118 So. 258.

Other authorities could be cited to like effect as those herein specifically noted. But they are cited in these cases and may be found also in note to Roman v. Lobe, supra, 243 N.Y. 51, 152 N.E. 461, 50 A.L.R. 1329 and Riley v. Chambers, supra, 181 Cal. 589, 185 P. 855, 8 A.L.R. 418.

Indeed, the author of the text under the heading "Brokers" in 12 C.J.S. p. 16, § 8, treats the subject upon the assumption the validity of such legislation is well settled. See also 12 C.J.S. § 8, p. 14.

It is clear enough, we think, that a real estate broker does occupy a fiduciary position, one of trust and confidence and our statute merely makes provision that those who engage in the business be those "who are trustworthy and competent to transact the business * * * in such manner as to safeguard the interests of the public". It must be borne in mind that the courts are not concerned with the wisdom or policy of the statute, and have the power to declare it invalid only when it clearly appears that it bears no real or substantial relation to the police power or the means adopted for affecting the object are manifestly arbitrary and unreasonable. 16 C.J.S. Constitutional Law, p. 572, § 198; Federal Power Commission v. Natural Gas Pipeline Co., 315 U. S. 575, 62 S.Ct. 736, 86 L.Ed. 1037.

We have observed that the statute (Sec. 306) provides full opportunity for notice and hearing, with compulsory attendance of witnesses, before any application for a license is denied or any license once issued is suspended. Careful provision is made that the Commission furnish the applicant or licensee a definite statement of its findings of fact and its reason therefor. This section then provides: "* * * The findings of the commission may be appealed to the circuit court of the county in which the licensee resides, provided an appeal is taken within thirty days after such final determination of the commission. Any licensee desiring to appeal under this section shall file with the board of commissioners, or some member thereof, a notice in writing that he appeals to the circuit court, with at least one solvent surety, payable to the State of Alabama, conditioned to prosecute such appeal to effect, and upon failure so to do, to pay all costs and damages which may be adjudged against him by the circuit court on such appeal; bond to be approved by the circuit court clerk of the county. Any cause when so appealed shall be tried de novo in the circuit court."

It is suggested in the opinion of Mr. Justice BROWN, a suggestion not found in brief of counsel, that the legislature has granted an appeal only to one whose license has been suspended and denied it to the applicant. True the above noted excerpts from the statute appear to be rather loosely drawn, and we are strongly inclined to the view no such distinction was intended and the use of the word "licensee" only might be properly construed as applicable also to one seeking a license. But we pretermit that question and leave it to one side and undetermined.

In any event, and without regard to the wording of the statute in this respect, due notice and hearing is provided before the commission and any arbitrary action on the part of the commission is subject to review in the courts. An omission of a specific right of appeal would of

consequence not render the Act invalid. 16 C.J.S. 1277 and 1288, Constitutional Law, §§ 626 and 629; 12 Amer.Jur. 281 and 307; 11 Amer.Jur. 1060.

We feel that further discussion is unnecessary. The excerpts herein noted from the opinion of courts for which we have the highest regard fully state our views and should suffice as a complete answer to the argument advanced against the validity of this statute, and serve all purposes of this appeal.

 We, therefore, conclude the statute is a valid exercise of the police power of the State and that the trial court erred in the ruling to the contrary. The judgments will accordingly be here reversed and the causes remanded.

Reversed and remanded.

BOULDIN, FOSTER, and LIVINGSTON, JJ., concur.

THOMAS and BROWN, JJ., dissent.

LAWSON, J., not sitting.

BROWN, Justice (dissenting).

Appellees in 6 Div. 18, a corporation, and in the other case an individual, were separately indicted by a grand jury empanelled in the Circuit Court of Jefferson County, Bessemer Division, for engaging in the private business of a real estate broker or real estate agent, without obtaining a permit from the "Alabama Real Estate Commission so to do," an offense denounced by § 298, Code 1940, T. 46, which provides: "It shall be unlawful for any person, co-partnership, association or corporation to act as a real estate broker or real estate salesman, or to advertise or assume to act as such real estate broker or real estate salesman without a license issued by the Alabama real estate commission. No co-partnership, association or corporation, shall be granted a license, unless every member or officer of such co-partnership, association or corporation, who actively participates in the brokerage business of such co-partnership, association or corporation, shall hold a license as a real estate broker or salesman, as hereinafter provided for, and unless every employee who acts as a salesman for such a co-partnership, association or corporation shall hold a license as a real estate salesman."

This statute originated in Act No. 344, entitled "An act to define, regulate, and license real estate brokers and real estate salesman [salesmen]; to create a State Real Estate Commission; and to provide a penalty for a violation of the provisions hereof," approved Aug. 27, 1927. Acts 1927, p. 335–345.

The circuit court was of opinion that said § 298, Code 1940, T. 46, is unconstitutional and so ruled in sustaining the defendants' demurrer to the indictment, and entering a final judgment discharging the defendants.

The case comes to us on the appeal of the State as authorized by § 370, T. 15, Code 1940.

This section limits the consideration and decision of this court to the constitutionality of the statute drawn in question by the ruling and judgment of the circuit court. State v. Street et al., 117 Ala. 203, 23 So. 807.

The act under consideration, now Chapter 14, T. 46, Code 1940, to epitomize some of its pertinent provisions, defines real estate brokers as "any person, firm, partnership, co-partnership, association or corporation, who, for a compensation or valuable consideration, sells or offers for sale, buys or offers to buy, negotiates the purchase or sale or exchange of real estate, or who leases or offers to lease, rents or offers for rent, any real estate or the improvements thereon for others, as a whole or partial vocation. * * * A real estate salesman within the meaning of this chapter is any person who, for a compensation or valuable consideration, is employed either directly or indirectly by a real estate broker to sell or offer to sell, or to buy or offer to buy, or to negotiate the purchase or sale or exchange of real estate, or to lease, to rent or offer for rent any real estate, or to negotiate leases thereof, or of the improvements thereon, as a whole or partial vocation. One act for a compensation or valuable consideration of buying or selling real estate of or for another, or offering for another to buy or sell, or exchange real estate, or leasing, or renting, or offering to rent real estate, except as herein specifically excepted, shall cause the person, firm, partnership, co-partnership, association or corporation, performing, offering, or attempting to perform any of the acts enumerated herein to become a real estate broker or a real estate salesman within the meaning of this chapter." Code 1940, T. 46, § 299.

450

Owners and lessors of real property, attorneys in fact acting under written power of attorney, and regular employees of owners and lessees acting in "respect to property so owned or leased, where such acts are performed in the regular course of, or as an incident to, the management of such property and the investment therein" and others not necessary to mention, are excepted from the influence of the act. Code 1940, T. 46, § 299.

Said act created "The Alabama Real Estate Commission" of three members, appointive, who, prior to appointment, must have been a resident of the state for five years, and whose vocation for a period of at least five years shall have been that of a real estate broker or real estate salesman. The act did not and the section of the Code into which it·was carried does not inhibit such appointees from continuing in such business, or provide any salary for them other than per diem and expenses from such as may be allowed from money arising from exactions from applicants seeking permits to engage in the private business of a real estate broker or agent. Code 1940, T. 46, § 300.

The Act of 1927, as amended by General Acts of 1931, p. 327, and brought forward in the Code of 1940, T. 46, § 301, provides "To whom licenses granted.—Licenses shall be granted only to persons who are trustworthy and competent to transact the business of a real estate broker or real estate salesman *in such manner as to safeguard the interests of the public,* and only after satisfactory proof has been presented to the board. * * *" [Italics supplied.]

The "Requisites of application" are that: "Every applicant for a real estate broker's license shall apply therefor in writing upon blanks prepared or furnished by the real estate commission. Such application shall be accompanied by the recommendation of at least two citizen real estate owners, not related to the applicant, who have owned real estate for a period of one year or more, and who have known applicant for a period of six months, in the county in which said applicant resides, or has his place of business, which recommendation shall certify that the applicant bears a good reputation for honesty, truthfulness, fair dealing and competency, and recommending that a license be granted to the applicant. Every application for a broker's license shall state the name of the person, firm, partnership, co-partnership, association or

corporation with which he will be associated in the business of real estate, and the location of the place, or places, *for* which said license is desired and set forth the period of time, if any, which said applicant has been engaged in the real estate business. Every applicant for a license shall furnish a sworn statement setting forth his present address, both of his business and residence, a complete list of all former places where he may have resided or been engaged in business for a period during the last five years, accounting for such entire period, and the length of such residence, together with the name and address of at least one real estate owner in each of said counties where he may have resided or have been engaged in business, and whether he has been convicted of a criminal offense involving moral turpitude, and if so, what offense. Every applicant for a salesman's license shall, in addition to the requirements of this section, also set forth the period of time, if any, during which he has been engaged in the real estate ·business, stating the name and address of his last employer, and the name and the place of business of the person, firm, partnership, co-partnership, association or corporation then employing him, or into whose service he is about to enter. The application shall be accompanied by a written statement by the broker in whose service he is about to enter, stating that in his opinion the applicant is honest, truthful, and of good reputation, and recommending that the license be granted to the applicant. Every applicant for a license, under the provision of this chapter, shall be accompanied by the license fee herein prescribed. In the event that the commission does not issue the license, the fee shall be returned to the applicant. The commission is expressly vested with the power and authority to make and enforce any and all such reasonable rules and regulations connected with the application for any license as shall be deemed necessary to administer and enforce the provisions of this chapter. All such rules and regulations to be subject to the approval of the governor." Code 1940, T. 46, § 302.

Section 303, Code 1940, T. 46, provides: "The commission, after application in proper form has been filed, shall, before refusing to issue a license, set the application down for a hearing and determination as hereinafter provided in section 306 of this title."

Section 304, provides inter alia, "This license shall show the name and address of the licensee and in case of a real estate salesman's license, shall show the name of the real estate broker by whom he is employed. Each license shall have imprinted thereon the seal of the commission, and in addition to the foregoing shall contain such matter as shall be prescribed by the commission. The license of each real estate salesman shall be delivered or mailed to the real estate broker by whom such real estate salesman is employed, and shall be kept in the custody and control of such broker. * * * The commission shall prepare and deliver to each licensee a pocket card, which card, among other things, shall contain an imprint of the seal of the commission, and shall certify that the person whose name appears thereon is a licensed real estate broker or real estate salesman, as the case may be, and if it is a real estate salesman's card, it shall also contain the name and address of his employer," and other matter that may be prescribed by the Commission.

Said section provides for the amount of fees, graduated from fifteen to five dollars, on a basis of county population on original applications, and from ten to two and one-half dollars, for renewals.

Said section further provides that the revocation of a broker's license "shall automatically suspend every real estate salesman's license granted to any person by virtue of his employment by the broker whose license has been revoked," and whenever the employment of a salesman of a broker is terminated, the broker must surrender the salesman's license to the commission, and makes it unlawful for such salesman to "perform any of the acts contemplated by this chapter." Code 1940, T. 46, § 304.

Section 305 provides for investigation by the commission of its own motion or on verified complaint in writing the conduct of licensees, and § 306 provides that "The commission shall, before denying an application for license or before suspending or revoking any license," set the matter down for hearing on evidence, with the power to compel the attendance of witnesses, and for the denial of such application, and the revocation of licenses theretofore issued for any violation of the act, and from such revocation an appeal to the courts is authorized.

Section 307 provides for granting licenses to non-residents of the state.

Section 309 provides that the commission may refer [prefer] a complaint for a violation of section 298, before any court of competent jurisdiction, "and it may take the necessary legal steps through the proper legal officers of this state to enforce the provisions hereof and collect the penalties herein provided."

Said section also prescribes: "Any person or corporation violating a provision of this chapter shall upon conviction thereof, if a person, be punished by a fine of not more than five hundred dollars, or by imprisonment for a term not to exceed six months or by both fine and imprisonment, in the discretion of the court, and if a corporation, be punished by a fine of not more than one thousand dollars. Any officer or agent of a corporation or member or agent of a co-partnership or association, who shall personally participate in or be accessory to any violation of this chapter by such co-partnership, association or corporation, shall be subject to the penalties herein prescribed for individuals. * * *" Code 1940, T. 46, § 309.

Funds arising from fees provided by § 304 and penalties provided in § 309 are to be paid into the state treasury and kept in a separate fund. The act provides (§ 300, Code 1940, T. 46): "The treasurer is directed to pay money out of the separate fund hereinabove provided upon the order of the secretary of the board of commissioners, countersigned by the chairman of the board of commissioners and approved by the governor, provided the total expenses for every purpose incurred shall not exceed the total fees and charges collected and paid into the state treasury and all moneys remaining in the separate fund herein provided for at the end of the fiscal year not expended as herein provided for shall be covered into the treasury and shall be and become a part of the general fund of the state." Code 1940, T. 46, § 300.

Before entering into an analysis of this statute, its scope, purpose and effect, we stop to inquire who or what is a real estate broker.

"A real estate broker, strictly speaking, is but a middleman, whose office it is to bring the principals together, with the understanding that they are to negotiate with each other, and trade upon such terms as may be mutually satisfactory." Allison et al. v. Fuller-Smith & Co., 20 Ala.App. 216, 101 So. 626, 628; Handley et al. v. Shaffer,

177 Ala. 636, 59 So. 286; Stout v. Thornhill, 16 Ala.App. 480, 79 So. 154.

"A broker is one who is engaged for others, on a commission, to negotiate contracts relative to property with the custody of which he has no concern." 12 Corpus Juris Secundum, Brokers, p. 5, § 1.

American Law Real Estate Agency (Walker) 2d Ed., p. 4: "A broker is one who is engaged for others on a commission to negotiate contracts relative to property, with the custody of which he has no concern."

8 Amer.Juris. p. 989, § 2: "As generally defined, a broker is an agent who, for a commission or brokerage fee, bargains or carries on negotiations in behalf of his principal as an intermediary between the latter and third persons in transacting business relative to the acquisition of contractual rights, or to the sale or purchase of any form of property, real or personal, *the custody of which is not intrusted to him for the purpose of discharging his agency.* * * * They act as negotiators in bringing other persons together to bargain; generally, they ought not to sell in their own names, *have no implied authority to receive payment, are not intrusted with the physical possession of the principal's goods when employed to buy or sell, and have no special property therein or lien thereon."* [Italics supplied.]

"They (real estate brokers) commonly function differently from an agent, in that they do not themselves conclude the contract for their principal, but serve merely as negotiators who find another person willing to buy or sell, as the case may be, and persuade to the closing of a contract. * * *." 4 Encyclopedia Britannica p. 233.

"Although a broker is an agent, he is distinguishable from an agent generally by reason of the fact that his authority is of a special and limited character in most respects. He derives his power and authority to bind his principal from the instruction given to him by the principal. As to his physical activities, a broker is an independent contractor." 8 Amer.Juris. p. 991, § 4; Am.Law Inst.Restatement, Agency, Vol. 1 p. 10, § 1; Ib. p. 12, § 2.

This statute denies to the ordinary citizen the right to seek employment in this field of innocuous endeavor, on the character and reputation he has builded for himself by righteous living and fair dealing, without the stamp of approval of the Alabama Real Estate Board, constituted, not of impartial officials of the state, but of persons who are interested and participating in this field.

It restricts the right of the real estate owner who desires to sell his property, and the right of one desiring to purchase to the selection of a broker or agent who holds a permit from said board, and renders void contracts employing one not so licensed. Knight v. Watson, 221 Ala. 69, 127 So. 841; Roman v. Lobe, 243 N.Y. 51, 152 N.E. 461, 50 A.L.R. 1329.

This statute sets up no standards for qualifying an applicant thereunder, based upon learning, education, experience or good character, but limits the right to qualify to those only, who in the judgment of the board, on proof, are competent and trustworthy to transact the business of a real estate broker or real estate salesman in such manner as to safeguard the interest of the public. Code 1940, T. 46, § 301.

Said act and the amendment thereto were not enacted by the legislature in the exercise of the taxing power which has its limitations in respect to innocuous trades, businesses and occupations, not productive of disorder, and injurious to the public welfare. Such occupations, even under that power, cannot be embarrassed by a tax that is so exorbitant as to prohibit, unreasonably restrain or oppress those who desire to exercise the right to pursue them. Adams et al. v. Curry, Commissioner of Revenue, et al., ante, p. 90, 8 So.2d 578.

The act under consideration must be sustained, if at all, under the police power. Knight v. Watson, supra.

6 Ruling Case Law, p. 188, § 187, in treating the limitations on the police power, observes: "Another principle involved in the police power is expressed by the well known maxim, salus populi suprema lex est. It has been said that this maxim is the foundation principle of all civil government, and that for ages it has been a ruling principle of jurisprudence. The police power has been described as the law of necessity, and as the power of self-protection on the part of the community. This doctrine may be said to furnish the key to what is within and what is without the boundaries of such power; not that a police regulation to be legitimate must be an absolute essential to the public welfare,

but that the exigency to be met must so concern such welfare as to suggest, reasonably, necessity for the legislative remedy. * * *"

And in § 194, at page 198, it is further observed: "In this connection it has been said that to justify the interposition of the authority of the state in enacting police regulations, it must appear that the interests of the public generally as distinguished from those of a particular class require such interference, for it is a rule that police power cannot be invoked to protect one class of citizens against another class, unless such interference is for the real protection of society in general. * * *."

While the question of necessity for such legislation is one of policy addressed to the judgment of the legislature, in the first instance, this determination is not conclusive as to the validity of the legislation when drawn into question as to its constitutionality. Then it is a question for judicial determination. Lisenba et al. v. Griffin et al., 242 Ala. 679, 8 So.2d 175; Tyson & Bro. United Theatre Ticket Offices, Inc. v. Banton, District Attorney, et al., 273 U.S. 418, 431, 47 S.Ct. 426, 428, 71 L.Ed. 718, 58 A.L.R. 1236; Wolff Packing Co. v. Court of Industrial Relations, 262 U. S. 522, 536, 43 S.Ct. 630, 67 L.Ed. 1103, 27 A.L.R. 1280.

This legislation in its scope and purpose is not limited in its application to agents occupying a position of confidence and trust wherein possession of property or funds is delivered into their custody and control. It applies to real estate brokers in the sense that they are middlemen or independent contractors, whose sole function is to bring the parties together to deal for themselves. It limits the right of the owner and purchaser to deal through only such as have been licensed by the board.

The functions and scope of authority of a real estate broker are those of personal service, and unprofessional, and, "Personal service cannot become affected 'with public interest' unless the service rendered is official in character, or is rendered in connection with a business 'affected with public interest' or 'devoted to a public purpose.'" City of Mobile v. Rouse, 233 Ala. 622, 625, 173 So. 266, 268, 111 A.L.R. 349, and annotations pages 353, 356; Noble et al. v. Davis, Ark., 161 S.W.2d 189; Duncan v. City of Des Moines, 222 Iowa 218, 268 N.W. 547.

If this field of legitimate and innocuous personal activity can be restricted and limited to those and only those who may obtain the stamp of approval of a board selected from an interested group under the guise of the exercise of the police power, to protect the public, then by like legislation this power may be applied to clerks engaged in the sale of goods in the mercantile businesses, to contractors engaged in the contracting business, farm laborers employed in agriculture, and servants employed in culinary and household services.

As observed in one of our most recent decisions, " * * * sanitary regulations of a retail grocery store, for the protection of the public health, do not, and probably could not, take the form of a license of clerks upon certificates of qualification after a course of study, etc." Board of Cosmetological Examiners of Jefferson County et al. v. Gibbons, 238 Ala. 612, 616, 193 So. 116, 119.

This observation is in accord with a long line of our decisions, running back through a third of a century, supported by the pronouncements of the United States Supreme Court, that: " ' * * * There are, of necessity, limits beyond which legislation cannot rightfully go. * * * If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety has no real or substantial relation to these objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts so to adjudge, and thereby give effect to the Constitution.' Mugler v. [State of] Kansas, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205. Such are the limitations upon the Legislature in the exercise of the police power which must be observed in the consideration of this case." Eidge v. City of Bessemer, 164 Ala. 599, 605, 51 So. 246, 248, 26 L.R.A.,N.S., 394; City Council of Montgomery v. Kelly, 142 Ala. 552, 557, 38 So. 67, 70 L.R.A. 209, 110 Am.St.Rep. 43; supported by Lawton v. Steele, 152 U.S. 133, 137, 14 S.Ct. 499, 38 L.Ed. 385; Leary v. Adams et al., 226 Ala. 472, 474, 147 So. 391; Alabama Independent Service Station Ass'n v. McDowell, Sheriff, et al., 242 Ala. 424, 6 So.2d 502, at page 507, and cases cited; City of Mobile v. Rouse, 233 Ala. 622, 623, 173 So. 266, 111 A.L.R. 349. See also Duncan v. City of Des Moines, 222 Iowa 218, 268 N. W. 547; Noble et al. v. Davis, Ark., 161 S. W.2d 189.

The right to follow any of the common innocuous occupations and contract in reference thereto are inalienable rights guaranteed by Section 1 of the Bill of Rights, guaranteeing to the citizen "liberty and the pursuit of happiness," and equal thereto is the right to own property and contract in respect to its disposition. Constitution 1901, § 1; Toney v. State, 141 Ala. 120, 37 So. 332, 67 L.R.A. 286, 109 Am. St.Rep. 23, 3 Ann.Cas. 319.

The character of legislation under consideration was brought into existence through the activities and pressure of the "National Association of Real Estate Boards," originating about the years 1919 and 1920, and has persisted, in consequence several state legislatures have been induced to enact laws, under the guise of the police power, for the protection and organization of its members, and manifestly to relieve the stress of competition in this innocuous occupation. 8 Amer.Juris. at p. 995, § 9, makes the following observation: "There is a difference of opinion as to the constitutionality of statutes requiring an applicant for a license to do business as a real-estate broker to file with his application a certificate of good moral character or otherwise furnish proof of good character to the licensing body. Some courts, including the United States Supreme Court, have sustained their constitutionality, while others have held them invalid"—and drops the subject.

This method of treatment is significant. It certainly leaves the question unsettled.

The courts of California, New York and Florida uphold the legislation, while the courts of Kentucky, North Carolina and Delaware, condemn it as unconstitutional class legislation.

The Supreme Court of Kentucky analyzes the authorities as follows:

"It is true that the Supreme Court of California sustained an act containing a similar requirement. Riley v. Chambers, 181 Cal. 589, 185 P. 855, 8 A.L.R. 418, and cited in support of its ruling the case of Hall v. Geiger-Jones Co., 242 U.S. 539, 37 S.Ct. 217, 61 L.Ed. 480, L.R.A.1917F, 514, Ann.Cas.1917C, 643, which upheld the Blue Sky Law of Ohio (Gen.Code §§ 6373—1 to 6373—24), requiring that every dealer in securities should be licensed and should establish his good repute to the satisfaction of the superintendent of banks. In reaching this conclusion, the Supreme Court of California took the position that there was no difference between the occupation of a dealer in securities and that of a real estate agent. It must not be overlooked that the Blue Sky Laws were adopted to meet a great and pressing danger. The people were annually paying hundreds of millions of dollars for worthless securities whose value they had no means of determining, and were the easy victims of the unscrupulous salesman.' But there is a wide difference between the sale of securities to a customer who has to rely on the representations of the salesman as to their value, and the buying, selling, or leasing of real estate which the customer may examine for himself, and which it is not easy to misrepresent.

"It is true that the real estate agent sometimes acts in a fiduciary capacity, but not more frequently than every other agent, factor, broker, or commission merchant. It likewise is true that the business sometimes offers opportunities for fraud and imposition, but such opportunities are not nearly so frequent as those offered by every other occupation in which the citizen may engage. If occasional opportunity for fraud is to be the test, then there is no reason why every grocer, every merchant, every automobile dealer, every keeper of a garage, and every manufacturer, and every mechanic who deals more frequently with the public in general and whose opportunities for fraud are far greater than those of the real estate agent or salesman, may not be put on the same basis. If that be done, then only those who, in the opinion of certain boards or the courts, have the necessary moral qualifications, will be permitted to engage in the ordinary occupations of life. The result will be that all others who fail to establish their moral fitness will not only be deprived of their means of livelihood, but will become a burden either on their families and friends or the community at large. In our opinion, the right to earn one's daily bread cannot be made to hang on so narrow a thread. Broad as is the police power, its limit is exceeded when the state undertakes to require moral qualifications of one who wishes to engage or continue in a business which, as usually conducted, is no more dangerous to the public than any other ordinary occupation of life. As said of the real estate agent in Hager, State Auditor, v. Walker, 128 Ky. 1, 107 S.W. 254, 15 L.R.A.,N.S., 195, 129 Am.St.Rep. 238: 'The occupation taxed is essentially a harmless one. It has none

of the features requiring police regulation, and there is no reason why the police power should be invoked concerning it.'

"Of course, moral fitness on the part of the real estate broker, and of every other business man, is a thing greatly to be desired, but, unless the business as ordinarily conducted is unusually dangerous to the public, we shall have to leave something to religious and moral training, to public opinion, and to the ordinary laws of the land. For the reasons given, we are constrained to the view that the statute, in so far as it makes the obtainment or retention of a license depend on the moral fitness of the applicant or licensee, is unconstitutional, and to this extent the case of Hoblitzel v. Jenkins, 204 Ky. 122, 263 S. W. 764, is hereby overruled." Rawles v. Jenkins et al., 212 Ky. 287, 279 S.W. 350, 352.

The subject matter of the decision in Hall v. Geiger-Jones Co., 242 U.S. 539, 37 S.Ct. 217, 61 L.Ed. 480, L.R.A.1917F, 514, Ann. Cas.1917C, 643, upon which the cases of California, New York and Florida are rested, is illustrated by the following taken from the opinion of the Supreme Court upholding the licensing of brokers under the "Blue Sky Law" of Ohio: "* * * The name that is given to the law indicates the evil at which it is aimed; that is, to use the language of a cited case, 'speculative schemes which have no more basis than so many feet of "blue sky;"' or, as stated by counsel in another case, 'to stop the sale of stock in fly-by-night concerns, visionary oil wells, distant gold mines, and other like fraudulent exploitations.' * * *" 242 U.S. 550, 37 S.Ct. 220, 61 L.Ed. 480, L.R.A.1917F, 514, Ann.Cas. 1917C, 643.

This description does not fit the real estate broker or agent as known in Alabama. However, the guilds pressing for this class of legislation, the legislatures enacting such legislation and the courts approving such legislation are putting that business in the class of "fly-by-night" concerns and visionary exploitators to curb which the Blue Sky Law of Ohio was enacted.

If the police power can be interposed to require a license for engaging in such occupation, then, by the same power, the legislature may require each and every licensee to execute a bond to protect the public and the clientele of such licensees from fraud and deceit practiced by such licensees in the conduct of their business.

In Bratton et al. v. Chandler et al., 260 U.S. 110, 43 S.Ct. 43, 67 L.Ed. 157, the court held [we quote the headnote]: "The law of Tennessee providing for licensing real estate brokers and salesmen and creating a real estate commission, where it authorizes the commission to 'require and procure' proof of the honesty, etc., of any applicant, before issuing him a license (Laws 1921, c. 98, § 8), does not contemplate that such proof may be procured by the commission secretly, without giving the applicant notice or opportunity to learn its nature and source and to meet it." And the opinion of the Court concludes as follows:—"* * * And the act construed as we construe it will take no power from the commission necessary to the performance of its duties, and will leave no power with it that it can exercise to the detriment of any right assured to an applicant for a license by the Constitution of the United States." 260 U.S. 110, 115, 43 S.Ct. 44, 67 L.Ed. 157.

A most able discussion of the principles of law involved in this case is found in State v. Harris, 216 N.C. 746, 751–765, 6 S.E.2d 854, 858, 128 A.L.R. 658, decided February, 1940, from which we take the following:

"Statutes regulating trades and occupations by the delegation of governmental power to boards and commissions formed largely of the groups affected, intended primarily to control the personnel of the business, have become so common as to affect progressively and importantly the social and economic life of the State. A large number of laws of that character may be listed which not only regulate but organize into autonomous corporations occupations ranging from the learned professions to the ordinary trades. U.N.C.Law Review, Vol. 17, p. 1.

"No independent administrative supervision is provided over these organizations. No report of their activities is made to any responsible branch of the government. No audit is made by the State, except where items may incidentally affect the State Treasury. These matters are left to internal control. The organizations are, so to speak, legislatively launched and put on their own.

"The stage of internal protest has been reached. In marginal cases controversies in the courts have arisen as to whether the organization has captured a sufficient quantum of public purpose to operate as an

agency of the government, or whether the police power of the State, ostensibly exercised for a public purpose, is not really farmed out to a private group to be used in narrowing the field of competition, or in aid of exploitation by creating remunerative positions in administration. Roach v. [City of] Durham, 204 N.C. 587, 169 S.E. 149; State v. Lawrence, 213 N.C. 674, 197 S.E. 586, 116 A.L.R. 1366. Without the aid of the statute these groups would be mere trade guilds, or voluntary business associations; with it they become State agencies, retaining, however, as far as possible, distinctive guild features. An exclusive self-governing status is achieved by the device of securing a majority membership on the administrative boards or commissions, and in aid of this the power of the State is heavily invoked by way of prosecution in the criminal courts of those who are unable to secure the approval of the Board and obtain license to engage in the occupation.

"It is this power of exclusion of fellow workers in the same field that gives to the subject its social significance, and invites our most serious consideration of the constitutional guaranties of personal liberty and individual right called to our attention.

"The statute is meagre in its expression of purpose in this regard. But the implication conveyed in the power to 'examine those who ought not to be admitted,' and to make rules and regulations in the interest of the public health, safety, and welfare in connection with such examinations, supports the suggestions in defendant's brief and argument that it was the purpose of the statute to empower the Commission to apply standards of educational and moral fitness to those who desire to choose and carry on the business, occupation, or trade—however it may be called. Indeed, if that is not its purpose, we fail to find anything else in the statute in the nature of a public purpose which would necessarily preserve the organization created as a State agency.

"The statute before us seems to overshoot the mark in several respects: In the discrimination produced by its territorial limitations; in the attempted delegation of the legislative function to create standards, and its failure to fix limits within which the discretion of the Commission may be exercised; and, in the more fundamental respect of its invasion of personal liberty and the freedom to choose and pursue one of the ordinary harmless callings of life—a right which we conceive to be guaranteed by the Constitution.

\* \* \* \* \* \*

"2. The statute authorizes the Commission (Sections 3 (1) (e), to 'require examination of persons not entitled to have issued to them a license as provided in this Act, such examination to cover subjects deemed necessary to promote the public health, safety and welfare of the people of the State of North Carolina'. Subsection (2) of this section provides for the suspension or revocation of licenses, after notice and hearing, 'on the grounds of any violation of the provisions of this Act or the rules and regulations promulgated by said Commission, not in conflict with \* \* \* this Act', and provides the right of appeal upon such suspension and revocation. Thus, an unlimited discretion is given to the Commission to set up standards of their own for admission to the business of 'dry cleaning and/or pressing', according to whatever rules or regulations they may conceive to be related to the 'public health, safety, and welfare of the people.'

"In licensing those who desire to engage in professions or occupations as may be proper subjects of such regulation, the Legislature may confer upon executive officers or bodies the power of granting or refusing to license persons to enter such trades or professions only when it has prescribed a sufficient standard for their guidance. 16 C.J.S., Constitutional Law, § 138, p. 373, and cases cited. Where such a power is left to the unlimited discretion of a board, to be exercised without the guide of legislative standards, the statute is not only discriminatory but must be regarded as an attempted delegation of the legislative function offensive both to the State and the Federal Constitution. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220; Thomas v. Mills, 117 Ohio St. 114, 157 N.E. 488, 54 A.L.R. 1220 \* \* \*.

"While the power to make rules and regulations to carry into effect the laws confided to them for administration is often given to administrative bodies, and while in instances there may be some doubt as to whether the proposed regulation is legislative in character or in pursuance of a delegable power, it is clear that in a statute of this kind, giving the

important power of admitting or excluding persons from a business, trade, or profession, only the Legislature can create the standards and provide the reasonable limits within which the power must be exercised. 11 Am.Jur., p. 947, Section 234, note 3; Annotations: 12 A.L.R. 1436, 54 A.L.R. 1105, 92 A.L.R. 403.

"But we do not mean to say that it was within the power of the Legislature itself to invoke the police power and set up standards of the kind suggested which might exclude persons from the ordinary non-professional and non-skilled occupations which, neither inherently nor in the ordinary manner of their conduct, present a menace to the public welfare. It is only necessary to say in this connection that if the Legislature had the power, the attempt to delegate it to this Commission in the manner attempted is not consistent with constitutional limitations.

"3. It will simplify discussion if we bear in mind that the controversy in this case does not concern the propriety of minor regulations of business and occupations which may be, and are, imposed generally on the principle sic utere tuo ut alienum non laedas, or to the still broader field of regulation under the police power which does not involve the question of exclusion from the business, trade, or occupation made the subject of regulation. There is a great body of decision upon that subject altogether too general for satisfactory application to the question before us. Appellant contends the power of the Legislature to impose or authorize the imposition of standards such as are contemplated in the law under review might exclude him from one of the ordinary callings of life, on the ground of educational or moral unfitness or for the want of technical, scientific skill and knowledge. He refers to the provisions of the Constitution, above quoted, and claims that they should protect him in the choice and pursuit of the occupation with which this controversy is concerned.

"It is not contended, of course, that these provisions of the Constitution confer upon any person the absolute right to choose and pursue any occupation he pleases, regardless of the public interest. The Legislature may, through appropriate laws, protect the public against incapacity, fraud, and oppression where, from the nature of the business or occupation or the manner of its conduct, the natural consequence

may be injurious to the public welfare. 11 Am.Jur., p. 1032. And in the exercise of this power it is well established that standards of personal fitness may be created and enforced by laws requiring the examination and licensing of those desiring to engage in the learned professions, and in occupations requiring scientific or technical knowledge and skill, some of which bring about a relation of trust or confidence between those who practice the trades or occupations and the clientele they serve. * * * At the other end of the occupational scale are the ordinary trades and occupations, harmless in themselves, in many of which men have engaged immemorially as a matter of common right, as to which it is uniformly held such standards may not be applied. Smith v. [State of] Texas, 233 U.S. 630, 34 S.Ct. 681, 58 L.Ed. 1129, L.R.A.1915D, 677, Ann.Cas. 1915D, 420; Bessette v. People, 193 Ill. 334, 62 N.E. 215, 56 L.R.A. 558; Dasch v. Jackson, 170 Md. 251, 183 A. 534. Somewhere between these extremes the slendering thread of police authority must come to an end, and constitutional guaranties of personal liberty must supervene.

* * * * * *

"We think, on practical analysis of cases presented, the rule will still hold good that regulation of a business or occupation under the police power must be based on some distinguishing feature in the business itself or the manner in which it is ordinarily conducted, the natural and probable consequence of which, if unregulated, is to produce substantial injury to the public peace, health, or welfare. When such classifications are made, the Court will pass on their reasonableness and determine as to the validity of the legislation.

"But the power to regulate a business or occupation does not necessarily include the power to exclude persons from engaging in it. * * * When this field has been reached, the police power is severely curtailed. 'The right of a citizen to pursue any of the ordinary vocations, on his own property and with his own means, can neither be denied nor unduly abridged by the Legislature for the preservation of such right is the principal purpose of the Constitution itself. In such cases, the limit of legislative power is regulation, and that power must be cautiously and sparingly exercised, unless the business is of such character as places it within the category of social and economic evils.' Ex

parte Dickey, 76 W.Va. 576, 85 S.E. 781, 782, L.R.A.1915F, 840; 2 Cooley's Constitutional Limitations, 8th Ed., p. 1329.

"* * * It follows that there is a well recognized gap between the regulation of a business or occupation and restrictions preventing persons from engaging in them to which courts must pay careful attention. While many of the rights of man, as declared in the Constitution, contemplate adjustment to social necessities, some of them are not so yielding. Among them the right to earn a living must be regarded as inalienable. Conceding this, a law which destroys the opportunity of a man or woman to earn a living in one of the ordinary harmless occupations of life by the erection of educational and moral standards of fitness is legal grotesquery.

"* * * Is there anything in this business, or calling, constituting a substantial menace to the public peace, health or welfare to which such restriction has a reasonable relation? Groping in a meager field, even with the diligent aid of counsel, we are unable to find it. Looking at the dry cleaning and/or pressing business in the light of the record and briefs and applying such common knowledge of the subject as we are permitted to use, we are confirmed in our view that it is an ordinary simple occupation which, conducted in the normal way, involves no special danger to the public peace, health, or welfare, and requiring no regimentation of personnel to keep it in safe channels. If so, exclusion of persons from its enjoyment as a means of livelihood must be attributed to some other purpose to be accomplished by the law, and is violative of constitutional guaranties.

"We do not recall that it has been contended that the occupation is one requiring a background of learning or scientific training or a special degree of technical skill; the facts would not warrant such contention. Nor has it been suggested that there is any greater opportunity for fraud in the business than that found in hundreds of other ordinary callings of life.

* * * * *

"Turning to the argument that the statute is justified as a measure intended to protect the public against fraud, we may observe that there is no business or occupation which is not likely to have its quota of dishonest men. The danger to the public comes from the character of the man and not from any unusual opportunity afforded him in the business, which is inherently amoral. Like any other business, morality is imparted to it only by the character of the men engaged in it. We would probably fail in the attempt to secure honesty as a by-product of industry through the process of starving out original sin. 'If occasional opportunity for fraud is to be the test, then there is no reason why every grocer, every merchant, every automobile dealer, every keeper of a garage, every manufacturer, and every mechanic who deals more frequently with the public in general and whose opportunities for fraud are far greater than those of the real estate agent or salesman, may not be put on the same basis. If that be done, then only those who, in the opinion of certain boards or the courts, have the necessary moral qualifications, will be permitted to engage in the ordinary occupations of life. The result will be that all others who fail to establish their moral fitness will not only be deprived of their means of livelihood, but will become a burden either on their families and friends or the community at large. In our opinion the right to earn one's daily bread cannot be made to hang on so narrow a thread. Broad as is the police power, its limit is exceeded when the state undertakes to require moral qualifications of one who wishes to engage or continue in a business which, as usually conducted, is no more dangerous to the public than any other ordinary occupation of life.' Rawles v. Jenkins, 212 Ky. 287, 292, 279 S.W. 350, 352."

As I have heretofore pointed out, this licensing act or statute is applicable to the real estate broker or agent as defined in this opinion who merely acts as a middle man or independent contractor, as well as to agents who by special arrangement with their principal may become fiduciaries, and the foregoing considerations and authorities lead me to the conclusion that there is no such general public interest in the occupation of real estate brokers and agents, as defined, and their practices as warrants legislation interposing the police power requiring a license of persons desiring to engage in such innocuous occupation. Therefore, in my judgment, said real estate brokers act of 1927 and the amendment thereof carried into the Code of 1940 as Chapter 14, Title 46, violates Section 1 of the Constitution

of Alabama guaranteeing to the citizens the right of liberty and the pursuit of happiness, the very thing the Constitution undertakes to guarantee and protect. Constitution 1901, Article 1, Section 1.

I am further of opinion that Section 306, Title 46, Code 1940, which provides for an appeal from an order revoking a license, but denies an appeal from an order denying an application for license, and Section 309, Title 46, Code 1940, which prescribed no punishment for a violation of said act by "associations" or "partnerships" as such, but does prescribe a punishment for the same act by a corporation of a fine of not exceeding $1,000, and in addition thereto a fine of $500 and imprisonment, against the officer or agent of the corporation who personally participates in or is accessory to such act, violate the provisions of the XIV Amendment of the Constitution of the United States, guaranteeing equal protection of the law. 6 R.C.L. 430, § 427.

Partnerships and unincorporated associations engaging in business, using a common name, are recognized by this act and other statutes as separate entities, and it is within legislative competence to provide for their punishment by fines for misdemeanors committed in the conduct of a business under such common name. See Code 1940, T. 7, §§ 141, 142, 143.

The mere fact that the legislature through the influence of pressure groups has incorporated into our law numerous statutes of the same character of this now under consideration, and to hold this law unconstitutional, will also brand others as unconstitutional, is no answer to the statement of applicable principles of constitutional law. The Constitution cannot be destroyed by the legislature in the enactment of such laws.

The rulings and judgment of the circuit court in these cases are in accord with these views, and, in my opinion, should be affirmed.

THOMAS, J., concurs in the foregoing dissent.

On Rehearing.

GARDNER, Chief Justice.

Upon original consideration of this cause the authorities bearing upon the constitutionality of statutes like the one here involved were carefully read and considered, and we have endeavored in the majority opinion to plainly state our views and the reasons underlying our conclusion.

The application for rehearing presents nothing new and ordinarily would call for no response. And were it not for the complaint of counsel for appellee that the opinion misconceives his insistence and places him in a false light of argument we would let the case go without further comment. But of course we are anxious that there be no misstatement of the position of counsel and of consequence feel that a brief response is appropriate.

It is urged on this application that we fell into grievous error wherein the opinion states, "counsel for appellee insists that the real estate business is innocent and harmless and not subject to the police power of the State * * *". And further that counsel, " * * * base their argument on the theory that real estate business is not subject to regulation." In supplemental brief counsel for appellee (p. 7) stated: "If the business is an innocent and innocuous business there is nothing in its nature that in any way endangers the public health, safety or morals, and there is no field of operation for the police power of the state." And we had understood the argument against the statute was based upon the theory thus announced.

The argument on this application is that the excerpt above noted from the opinion is a misconception of the position of counsel and an unintentional erroneous statement thereof. The brief continues: "If we insisted that the real estate business was not subject to legislative regulation, we would advance an unsound proposition, and we do not like to be put in that light. The court is not called upon·to determine in this case whether the real estate business is or is not subject to legislative regulation. For the purpose at hand we concede that it is, but that is far short of conceding that people may be excluded from engaging in that business until they convince the Alabama Real Estate Commission that they are competent to transact it in the public interest." Counsel further states in brief: "We did not, we think, assert that the real estate business is not subject to the police power of the State or legislative regulation, but what we did attempt to make clear is the difference between regulating the business and prohibiting people from engaging in the business."

We have thus stated the position of counsel upon petition for rehearing that

there may be no misunderstanding and to remove all doubt of misconception.

It may be due to our own shortcomings, but we find difficulty in following the argument to the distinction sought to be made. As we view it the real estate business is carried on, of course, by human agency, and those who are engaged in the business act as agents and in a fiduciary capacity. And a law requiring that such agents meet a test for competency and integrity of character to safeguard the public interest is, in our opinion, nothing more nor less than a regulatory statute and comes within the regulatory influence of the police power of the State. There is not, however, and could not be, any general prohibition against engaging in the real estate business. And perhaps clearly enough no such legislation has ever been attempted. But, as the majority opinion notes, numerous states have enacted laws placing certain regulatory restrictions upon those who engage in the real estate business which statutes have been upheld under the police power by the overwhelming weight of judicial authority which we have here approved. This is regulation—not prohibition. But we forego further discussion.

We merely intended in this response to make sure there has been no misconception of argument of counsel and to more accurately state his position in brief.

The application is due to be denied.

Application overruled.

BOULDIN, FOSTER, and LIVINGSTON, JJ., concur.